MARY V. MISTER *et al.*, Plaintiffs-Appellees, v. A.R.K. PARTNERSHIP *et al.*, Defendants-Appellants.

Second District   No. 2—89—1076

Opinion filed April 25, 1990.—Rehearing denied May 22, 1990.

REINHARD, J., specially concurring.

Appel & Appel, Ltd., of Lansing (Thomas A. Appel, of counsel), for appellants.

Kinoy, Taren, Geraghty & Potter, P.C., of Chicago (Miriam N. Geraghty, of counsel), for appellees.

JUSTICE INGLIS delivered the opinion of the court:

Defendants, A.R.K. Partnership (A.R.K.) *et al.*, owners and managers of certain rental apartments, bring this appeal from an order of the circuit court of Du Page County denying their motion to dissolve a temporary restraining order entered against them. The restraining order prohibited defendants from renting two of their apartments to any persons except plaintiffs during the pendency of plaintiffs' separate civil rights action against defendants before the Illinois Human Rights Commission (the Commission). That action is based on plaintiffs' claim that defendants' policy of refusing to rent apartments to unmarried couples of the opposite sex violates the prohibition against discrimination based on sex or marital status found in the Illinois Human Rights Act (the Act) (Ill. Rev. Stat. 1987, ch. 68, par. 1—102(A)).

On appeal, defendants raise several arguments in support of their

contention that the trial court should have dissolved the temporary restraining order entered against them. Defendants claim the trial court erred in finding that: (1) plaintiffs demonstrated a likelihood of success on the merits of their complaint, because the Act does not protect unmarried cohabitation; (2) plaintiffs would suffer irreparable injury unless the temporary restraining order was granted; and (3) the equities balanced in plaintiffs' favor. Defendants also argue that their constitutional rights to religious freedom and their right to use their property as they wish would be impaired if they were forced to rent to unmarried couples. The resolution of this cause requires this court to address an issue of first impression in Illinois, namely, whether the Act prohibits discrimination against unmarried, cohabiting couples in real estate transactions.

The facts underlying this appeal can be briefly summarized. Plaintiffs in this action are two unmarried couples. Each couple is comprised of a male and female who presently live together. On July 8, 1989, plaintiffs Mary Mister and Robert Keene responded to a newspaper advertisement seeking tenants for the LeClair Apartments, defendants' apartment complex in Wheaton, Illinois. Mister and Keene met with defendant Sandi Martin, a rental agent for the LeClair Apartments, and selected a two-bedroom apartment to rent for $675 per month beginning September 1, 1989. Mister and Keene submitted $50 to process their credit applications and $100 to hold the apartment until they moved in. Subsequently, the couple gave notice to their previous landlord that they would be moving out of their apartment by September 1, 1989. On July 13, 1989, Jan Rowe, a representative of defendant A.R.K., contacted Mister at work and asked if she and Keene were married. Mister responded that they were not and that, although the two were engaged, no definite wedding date had been set. Rowe informed Mister that defendants had a strict policy against renting apartments to unmarried couples of the opposite sex. On July 17, 1989, Mister and Keene received a letter from defendant Bruno Zordan of A.R.K. informing them that their "application was rejected because of our company policy on unmarried couples." Plaintiffs' $150 advance money was returned with the letter.

Plaintiffs Steve Dunn and Becki Rhodes also applied to rent a two-bedroom apartment at the LeClair apartments. The two hoped to move into the apartment complex on August 1, 1989. After selecting an apartment, Dunn and Rhodes filled out credit applications and submitted $50 to process the applications and $100 to hold the apartment until they moved in. At some point thereafter, Dunn received a call from Norm Martin of LeClair Apartments. Martin asked Dunn

whether he and Rhodes were married, and Dunn responded that they were not. On July 12, 1989, Dunn was contacted by Jan Rowe of Le-Clair Apartments to inform him that the owners would not rent apartments to unmarried couples. The $150 deposit was returned to them. Dunn and Rhodes' previous lease expired on July 31, 1989, and the couple was only able to extend the lease until the end of August.

All four plaintiffs contended that they were ready, willing and able to move into LeClair Apartments on September 1, 1989. Both couples averred that the apartments they selected were convenient, within their price range and attractive to them. It is not disputed that defendants would have rented to plaintiffs if they were married or if each opted to live with a member of the same sex (*i.e.*, two males or two females could rent an apartment at LeClair). Although defendants assert that the basis for their rental policy is their religious belief that unmarried cohabitation is immoral, there is nothing in the record concerning defendants' religious beliefs.

On July 25, 1989, plaintiffs filed a complaint against defendants with the Commission. The complaint alleged that defendants' policy of refusing to rent to unmarried couples of the opposite sex violated plaintiffs' right to be free from discrimination in real estate transactions on the basis of sex or marital status (Ill. Rev. Stat. 1987, ch. 68, pars. 1—102(A), 3—102(A)). On July 31, 1989, plaintiffs appeared before the circuit court and requested emergency relief in the form of a temporary restraining order pursuant to section 7—104 of the Act (Ill. Rev. Stat. 1987, ch. 68, par. 7—104). Plaintiffs sought to prevent defendants from renting two units at LeClair apartments to anyone other than plaintiffs. Plaintiffs alleged that, if the order was not issued, defendants might rent all LeClair apartment units and render ineffectual any prospective relief from the Commission. Submitted along with plaintiffs' complaint was the certification of the director of the Illinois Department of Human Rights stating, *inter alia*, that the civil rights complaint alleged a *prima facie* violation of the Act. (See Ill. Rev. Stat. 1987, ch. 68, par. 7—104(A)(1).) The trial court entered an agreed order temporarily restraining defendants from renting the apartments that plaintiffs sought.

Subsequently, after a hearing at which both parties were represented, the trial court entered a temporary restraining order enjoining defendants from renting the apartments in question. The court found, among other things, that plaintiffs had demonstrated a likelihood that they would succeed on the merits of their claim before the Commission; that plaintiffs might be irreparably harmed if the restraining order did not issue because defendants might rent all availa-

ble units at the LeClair Apartments and thus render ineffective any relief awarded by the Commission; and that the injury to plaintiffs if no restraining order issued would be greater than that to defendants if they were restrained. Defendants were enjoined from renting two apartments at LeClair to anyone but plaintiffs pending further order of the court. The court required plaintiffs to post bond with their attorney in an amount equal to two months' rent.

On September 8, 1989, defendants filed a motion to dissolve the temporary restraining order. After hearing argument from counsel for both parties on September 18, 1989, the trial court denied the motion to dissolve the temporary restraining order. Defendants now appeal from the entry of that order.

■ The Act provides that, generally, the Commission, not the circuit courts of Illinois, has exclusive jurisdiction over civil rights complaints. (*People ex rel. Illinois Department of Human Rights v. Arlington Park Race Track Corp.* (1984), 122 Ill. App. 3d 517, 520-21.) Section 7—104(A)(1) of the Act, however, also allows a civil rights complainant to petition the circuit court for temporary relief to prevent a civil rights respondent "from doing or causing any act which would render ineffectual an order which the Commission may enter with respect to the complainant." (Ill. Rev. Stat. 1987, ch. 68, par. 7—104(A)(1).) The circuit court proceedings in most cases are governed by the established rules for injunctive relief. (Ill. Rev. Stat. 1987, ch. 68, par. 7—104(A)(2).) Where injunctive relief is sought in the case of alleged discrimination in a real estate transaction, however, the Act provides that such relief must be limited to five days in duration unless the defendant agrees otherwise or the court finds that there is substantial evidence of discrimination. (Ill. Rev. Stat. 1987, ch. 68, par. 7—104(A)(3).) Here, defendants have not argued that the length of the injunction is improper.

■ There are three kinds of injunctive relief that may be awarded by Illinois courts: a temporary restraining order, a preliminary injunction, and a permanent injunction. (*Buzz Barton & Associates, Inc. v. Giannone* (1985), 108 Ill. 2d 373, 385.) In the present case, plaintiffs were awarded what is usually the most transitory of the three varieties of injunctive relief, a temporary restraining order. Where, as here, the defendant is afforded notice and a hearing, there is no practical difference in results between a temporary restraining order and a preliminary injunction. (*Kable Printing Co. v. Mount Morris Bookbinders Union Local 65-B Graphic Arts International Union* (1976), 63 Ill. 2d 514, 524.) A party seeking a preliminary injunction (or its functional equivalent, an indefinite temporary restrain-

ing order with notice and a hearing) must establish that: (1) he possesses a certain and clearly ascertained right which needs protection; (2) he will suffer irreparable harm without the protection of an injunction; (3) there is no adequate remedy at law for his injuries; (4) there is a substantial likelihood of success on the merits; and (5) in the absence of preliminary relief, he would suffer greater harm than would the defendant if relief were to issue. (*Village of Lake in the Hills v. Laidlaw Waste Systems, Inc.* (1986), 143 Ill. App. 3d 285, 291.) The decision whether to grant a preliminary injunction rests within the trial court's broad discretionary powers, and appellate review of the court's order is limited to a determination of whether the court has abused its discretion. *Shodeen v. Chicago Title & Trust Co.* (1987), 162 Ill. App. 3d 667, 673.

On appeal, defendants argue that three of the above criteria were not met and, therefore, that the trial court erred in denying the motion to dissolve the restraining order. Defendants assert that plaintiffs did not demonstrate: (1) a likelihood of success on the merits of their civil rights action; (2) that they would suffer irreparable harm if the injunction did not issue; or (3) that the balance of equities favored plaintiffs. Because we agree with defendants that plaintiffs failed to demonstrate a likelihood of success on the merits of their civil rights complaint before the Commission, we need only address the first of defendants' contentions.

To warrant injunctive relief, plaintiffs must demonstrate a likelihood of success on the merits of their underlying civil rights action filed with the Commission. However, plaintiffs are not required to make out a case that would entitle them to relief on the merits. Instead, they need only show that they raise a "fair question" about the existence of their right and that the court should preserve the status quo until the case can be decided on the merits. (*Buzz Barton & Associates*, 108 Ill. 2d at 382.) Here, defendants claim that plaintiffs cannot prevail on the merits because the Act does not protect cohabitation between unmarried adults of the opposite sex. Because the facts are not substantially in dispute, the question here is, by what legal standard are we to measure plaintiffs' likelihood of success on the merits? In other words, we are required to make a threshold determination of whether plaintiffs' conduct (unmarried cohabitation) is protected under the Act before we can determine if it was an abuse of discretion for the trial court to conclude that plaintiffs' factual situation evidenced a likelihood of success on the merits. Without such a legal determination, it would be impossible to gauge the strength of plaintiffs' case. (See *Professional Business Management, Inc. v. Clark*

(1967), 83 Ill. App. 2d 236, 242.) The resolution of this purely legal question is proper here and does not usurp the authority of the Commission, because the question of the scope of an administrative agency's power or authority is ultimately a judicial function. *Mitee Racers, Inc. v. Carnival-Amusement Safety Board* (1987), 152 Ill. App. 3d 812, 816.

The Act protects against discrimination on the basis of "race, color, religion, sex, national origin, ancestry, age, marital status, [and] physical or mental handicap." (Ill. Rev. Stat. 1987, ch. 68, par. 1—102(A).) Marital status is defined as "the legal status of being married, single, separated, divorced or widowed." (Ill. Rev. Stat. 1987, ch. 68, par. 1—103(J).) The complaint plaintiffs filed with the Commission alleges that defendants' policy of refusing to lease apartments to unmarried couples of the opposite sex constitutes unlawful discrimination on the basis of marital status and sex. Defendants, on the other hand, argue that the Act does not protect plaintiffs' conduct. Our search of Illinois law presents no case dealing with this question, and thus the issue here is one of first impression in this State.

Defendants argue that their refusal to rent to plaintiffs is based on the nature of each couple's consensual relationship, not their sex or marital status. Defendants note that the policy underlying the Act is the State's desire to "secure for all *individuals* within Illinois the freedom from discrimination." (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 68, par. 1—102(A).) Thus, defendants argue, their policy is based not on each plaintiffs' *individual* marital or sexual status, but on the nature of each couple's relationship. Moreover, defendants note, the Act specifically allows "[r]estricting the rental of rooms in a housing accommodation to persons of one sex." (Ill. Rev. Stat. 1987, ch. 68, par. 3—106(F).) Although this exception is not directly applicable here because defendants' apartment complex is not within the Act's definition of a "housing accommodation" (Ill. Rev. Stat. 1987, ch. 68, par. 3—101(C)), defendants contend that this exception shows the legislature's recognition that separation of the sexes can sometimes be permissible.

Plaintiffs, on the other hand, argue that defendants, by suggesting that the basis of their discrimination is plaintiffs' "relationship," distort the question of whether each plaintiff, individually, is being improperly discriminated against. Plaintiffs note that the reason defendants will not rent to them is because each plaintiff couple is comprised of single people of the opposite sex. If each plaintiff were married to the person with whom he or she wishes to live, defendants would not object. Similarly, if each plaintiff were of the same sex as the person

with whom he or she wishes to live, defendants would not object. Thus, plaintiffs claim, the "relationship" defendants find objectionable is defined solely with regard to each plaintiffs' marital status and sex, each of which is a characteristic the Act protects from discrimination. This is the basis for plaintiffs' claim that the Act protects them from discrimination based upon their desire to live together as single people of the opposite sex.

■ Our object in interpreting the statute is to ascertain the intent of the legislature. In doing so, we must first look to the statutory language itself. Where such language is clear and unambiguous, the court may not rely on external aids to construction. (*In re Marriage of Logston* (1984), 103 Ill. 2d 266, 277.) We believe that the language of the Act does not dispositively determine which of the two interpretations advanced here is correct. Where, as here, a statute is unclear or susceptible to more than one meaning, the court must interpret the statute to clarify its application. (*Eckman v. Board of Trustees for the Police Pension Fund* (1986), 143 Ill. App. 3d 757, 762.) In such circumstances, a court should look to similar statutes as an aid to construction. (*Di Falco v. Board of Trustees of the Firemen's Pension Fund of the Wood Dale Fire Protection District No. One* (1988), 122 Ill. 2d 22, 27.) Comparison of similar enactments is proper even if the statutes are not strictly *in pari materia. Biggiam v. Board of Trustees of Community College District No. 516* (1987), 154 Ill. App. 3d 627, 642.

In determining whether the Act protects cohabitation by unmarried adults of the opposite sex, we would be remiss if we did not examine the public policies embodied in the criminal prohibition against fornication found in section 11—8 of the Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1987, ch. 38, par. 11—8) and the statutory renouncement of common-law marriages found in section 214 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1987, ch. 40, par. 214).

The statutory fornication provision was in effect the time the Act was adopted, when the alleged discrimination occurred, and also when the complaint with the Commission was filed. The provision stated:

"(a) Any person who cohabits or has sexual intercourse with another not his spouse commits fornication if the behavior is open and notorious." (Ill. Rev. Stat. 1987, ch. 38, par. 11—8(a).)

We note, however, that this section of the Code was recently amended, effective January 1, 1990. (See Pub. Act 86—490, eff. Jan. 1, 1990 (amending Ill. Rev. Stat. 1987, ch. 38, par. 11—8).) This amendment eliminated the "cohabits or" from the previous version.

Thus, under the new law, the legislature has determined that the mere act of cohabitation with "another not his spouse" is not a violation of the fornication statute. Nevertheless, defendants argue, based on section 11—8 of the Code that was in effect at the time the Act was adopted and at the time of the complaint, that the legislature could not have intended to protect from discrimination the same behavior that used to be deemed criminal in nature.

In *Jarrett v. Jarrett* (1979), 78 Ill. 2d 337, 345, the Illinois Supreme Court reaffirmed that the fornication statute expresses this State's public policy against open and notorious nonmarital cohabitation. Although it seems that the criminal prohibition against fornication may have fallen into disuse (see *People v. Green* (1916), 276 Ill. 346 (most recent appellate record of a successful fornication prosecution)), the court in *Jarrett* gave the policy underlying the fornication statute continued vitality in the marital dissolution setting. (*Jarrett*, 78 Ill. 2d at 346-47.) The court there stated that both the "fornication statute and the Illinois Marriage and Dissolution of Marriage Act evidence the relevant moral standards of this State, as declared by our legislature." (*Jarrett*, 78 Ill. 2d at 346.) Thus, the criminal prohibition against fornication continues to represent Illinois' public policy on this issue. Furthermore, we need not consider what effect the revised fornication statute has on *Jarrett* and the public policy of this State.

■ Plaintiffs' interpretation of the Act would have us conclude that the legislature intended to protect from discrimination those individuals who choose to cohabit with a person of the opposite sex without entering into marriage. The fornication statute, as it existed when plaintiffs attempted to rent the apartments, evidenced this State's policy against such a practice. We believe plaintiffs' interpretation of the Act is in conflict with the long-standing public policy reflected by the fornication statute. Statutory provisions relating to the same subject matter should be construed harmoniously where possible. (*Howard v. Board of Education of Freeport School District No. 145* (1987), 160 Ill. App. 3d 309, 312.) Therefore, defendants' interpretation of the Act, which is in greater harmony with the fornication statute then in effect, should be preferred over that interpretation advanced by plaintiffs.

Plaintiffs, however, argue that their interpretation of the Act does not conflict with the fornication statute because the record does not indicate that their cohabitation was open and notorious, an essential element of the statute. It is true that only open and notorious unmarried cohabitation offends public policy (*Jarrett*, 78 Ill. 2d at 346), but plaintiffs miss the point when they state that their conduct prior to

this litigation had not been open and notorious. We consider the mere fact that unmarried couples, such as plaintiffs, attempted to rent apartments is sufficient to satisfy the open and notorious requirement. To rule otherwise would require defendants, as the apartment owners, to rent to persons who, in effect, would have been violating the fornication statute.

It is much more likely that the legislature, cognizant of the public policy against open and notorious cohabitation, declined to extend the Act's protections to unmarried cohabitants regardless of whether the couple's conduct was open and notorious. Such a stance expresses neither approval nor disapproval of discreet cohabitation; couples who wish to live together without being married can certainly still do so, but they must find a landlord who does not object to the arrangement. The Act's failure to protect such couples from "discrimination" merely evidences the legislature's hesitancy to require landlords to acquiesce. This position is entirely consistent with the State's dichotomous public policy on cohabitation, which is to respect "purely private relationships" without debasing "public morality" (*Jarrett*, 78 Ill. 2d at 346).

■ The public policy embodied in Illinois' statutory renouncement of common-law marriages is similarly relevant here. (Ill. Rev. Stat. 1987, ch. 40, par. 214.) The legislature has refused to confer a legal status on such relationships because this would contravene Illinois' strong public policy in favor of strengthening and preserving the integrity of marriage. (*Hewitt v. Hewitt* (1979), 77 Ill. 2d 49, 62.) Our State's public policy disfavors private contractual alternatives to marriage. (*Hewitt*, 77 Ill. 2d at 64.) Our supreme court has stated:

> "There are major public policy questions involved in determining whether, under what circumstances, and to what extent it is desirable to accord some type of legal status to claims arising from such relationships. Of substantially greater importance than the rights of the immediate parties is the impact of such recognition upon our society and the institution of marriage. Will the fact that legal rights closely resembling those arising from conventional marriages can be acquired by those who deliberately choose to enter into what have heretofore been commonly referred to as 'illicit' or 'meretricious' relationships encourage formation of such relationships and weaken marriage as the foundation of our family-based society?" (*Hewitt*, 77 Ill. 2d at 58.)

It is not the role of the judiciary to question the propriety of clearly established public policies or to assess their continuing vitality in light

of changing societal norms. (See *Hewitt*, 77 Ill. 2d at 60-61.) In light of the legislature's clear expression of a policy disfavoring private alternatives to marriage, it seems patently incongruous to suggest that the legislature would have afforded the Act's heightened protections to unmarried cohabitants.

We wish again to emphasize that our inquiry here is directed only toward discovery of the legislature's intended treatment of unmarried, cohabiting couples. In arriving at its policy in this regard, the legislature was not limited to either outlawing such practices or affording them a protected status under the law. A vast middle ground exists wherein such conduct might be neither prohibited by the State nor protected from private disapprobation. Only a very few suspect classifications, such as those drawn on the basis of race or religion, have been afforded the Act's heightened protection against discrimination by private citizens. Plaintiffs here argue that the State has not chosen to place unmarried cohabitation on the middle plane and instead has elevated them to the same level as those classifications which deserve the law's highest protections. Our exploration of the statutory provisions regarding fornication and common-law marriage has been undertaken only to assist us in determining whether the legislature could have intended such a result in light of the State's longstanding public policies in this regard. We find plaintiff's interpretation of the legislature's intent to be irreconcilable with the State's established policies disfavoring unmarried cohabitation and common-law marriage.

■ We hold, therefore, that the Act's prohibition against discrimination on the basis of sex or marital status does not include a landlord's refusal to rent an apartment to unmarried persons of the opposite sex.

Furthermore, we do not find plaintiffs' other arguments to be compelling enough to detract from our holding. Plaintiffs direct our attention to a recent legislative attempt to amend the Act and claim that it is evidence of the legislature's understanding that unmarried cohabitants are presently afforded protection under the Act. This amendatory effort, which would have specifically excluded unmarried cohabitants from the Act's protections, passed the House of Representatives but was not acted upon by the Senate. (See 86th Gen. Assem., House Bill 1158, 1989 Sess.) We can ascribe little weight to this failed attempt to amend the law, as unsuccessful attempts to amend legislation generally are an uncertain guide to legislative intent. (*Roberts v. Western-Southern Life Insurance Co.* (N.D. Ill. 1983), 568 F. Supp. 536, 551 n.38.) Thus, the legislative history supports our

conclusion that the Act was not intended to protect unmarried, cohabiting couples from discrimination.

■ We also reject plaintiffs' contention that, because the Act is to be construed liberally, we should extend its protections to them. It is true that the Act, because it is remedial legislation, should be interpreted liberally to effect its purpose. (*Board of Trustees of Community College District No. 508 v. Human Rights Comm'n* (1981), 88 Ill. 2d 22, 26.) The rule of remedial construction, however, is a rule to be employed "in favor of those whom the legislation was intended to protect." (See *Equal Employment Opportunity Comm'n v. Pattin-Marion, A Division of Eastern Co.* (S.D. Ill. 1984), 588 F. Supp. 41, 45.) Our inquiry here is whether unmarried cohabitants are, in fact, intended to be protected under the Act. It would serve no purpose to apply a rule of liberal construction to bring plaintiffs within the Act's coverage when, as we have said, the rule is applied only in favor of those who are intended to be protected under the Act.

Finally, plaintiffs refer us to other decisions in which prohibitions against discrimination on the basis of "marital status" were applied to unmarried cohabitants of the opposite sex. We do not find these cases helpful to the disposition of this cause. The only one of these cases in which an Illinois court addressed this question arose under a Chicago municipal ordinance, not the Act, and the plaintiff in that case was not living with an adult of the opposite sex. (*Wolinsky v. Kadison* (1983), 114 Ill. App. 3d 527.) In addition, none of the Commission's decisions cited by plaintiffs specifically addresses the question of whether the Act protects unmarried, cohabiting couples from discrimination. Three cases involve married spouses challenging an employer's anti-nepotism policies. (*In re Ray* (Dec. 6, 1988), ___ HRC Rep. ___ (No. 1985CF749); *In re Gideon* (Nov. 18, 1985), 20 HRC Rep. 25 (No. 1984SN0269); *In re Burton* (Aug. 29, 1984), 13 HRC Rep. 246 (No. 1981SF0161).) The fourth Commission decision cited by plaintiffs only assumed, without deciding, that the Act protected unmarried cohabitants, due to the fact that the respondent in that case waived consideration of the issue. (*In re Niquette* (Dec. 6, 1988), ___ HRC Rep. ___ (No. 1985CH0023).) Consequently, there is no analysis from these cases upon which we might base a decision contrary to the one we have reached.

Moreover, the out-of-State cases plaintiffs cite in support of their interpretation of the Act do not demonstrate, as does the instant case, the need to reconcile that jurisdiction's civil rights statute with statutorily embodied public policies disfavoring unmarried cohabitation and common-law marriage. (See, *e.g., State of Minnesota by Mc-*

*Clure v. Sports & Health Club, Inc.* (Minn. 1985), 370 N.W.2d 844; *State of Minnesota by Johnson v. Porter Farms, Inc.* (Minn. App. 1986), 382 N.W.2d 543; *State of Minnesota by Cooper v. French* (Minn. App. Oct. 31, 1989), No. C2—89—1064 (unpublished order).) Plaintiffs refer us to only one case in which this issue was addressed. That case, decided by an administrative law judge for the Minnesota Department of Human Rights, noted that in Minnesota, the criminal statute regarding fornication had fallen into disuse. (*State of Minnesota by Cooper v. French* (March 15, 1989), No. 1700—3082—2, slip op. at 2.) Conversely, in Illinois, our supreme court has reaffirmed that the criminal prohibition against fornication remains a viable embodiment of this State's public policy (*Jarrett*, 78 Ill. 2d at 346) and has recognized Illinois' public policy against common-law marriage (*Hewitt*, 77 Ill. 2d at 62-63.) We also note the recent decision in which the supreme court of the State of Alaska determined that the State's prohibition against discrimination on the basis of "marital status" included unmarried, cohabiting couples of the opposite sex. (*Foreman v. Anchorage Equal Rights Comm'n* (Alaska 1989), 779 P.2d 1199, 1203.) In reaching its decision, the court placed considerable emphasis on the fact that Alaska's criminal fornication statute, unlike that of Illinois, had been repealed and was no longer a viable expression of that State's public policy. *Foreman*, 779 P.2d at 1202.

None of the cases to which plaintiffs have directed our attention is of assistance in determining whether the Illinois legislature intended to extend the Act's protections to unmarried, cohabiting couples. These cases are deficient mainly because they do not help us reconcile plaintiffs' interpretation of the Act, which would protect unmarried cohabitation, with Illinois' apparently viable public policy against such practices. We believe that our holding today, which is that the Act did not protect plaintiffs' status as unmarried, cohabiting couples at the time of the alleged discrimination, represents the most appropriate way in which the statutes can be read harmoniously.

■■ Having concluded that plaintiffs are not protected by the Act, we now address the question of whether the trial court abused its discretion by finding that plaintiffs demonstrated a likelihood of success on the merits of their civil rights complaint before the Commission. Clearly, if the Act does not protect unmarried, cohabiting couples from discrimination, then plaintiffs' situation demonstrates no basis upon which they could succeed before the Commission. Accordingly, we hold that the trial court abused its discretion by making a contrary finding. Since no showing of a likelihood of success on the merits is possible, the trial court erred by granting plaintiffs injunc-

tive relief and should have granted defendants' motion to dissolve the restraining order. This conclusion obviates the need to consider the other issues raised and argued on appeal.

The order of the circuit court of Du Page County is reversed.

Reversed.

GEIGER, J., concurs.

JUSTICE REINHARD, specially concurring:

While I concur with much of the majority's analysis and in the result reached, I do not agree with the reliance placed by the majority on the fornication statute to justify an expression of public policy as it may relate to the Illinois Human Rights Act (Act). Rather, I would rely on the legislative debate at the time of the enactment of the Act in order to ascertain the legislative intent behind the relevant portion of the Act at issue here.

Where, as here, a statute is susceptible of two interpretations, it becomes proper to examine sources other than its language for evidence of legislative intent. (*In re Marriage of Logston* (1984), 103 Ill. 2d 266, 279.) Debates on the floor of the General Assembly will be examined in this regard to ascertain the legislative intent underlying specific legislation. (*Morel v. Coronet Insurance Co.* (1987), 117 Ill. 2d 18, 24.) Statements made by members of the General Assembly in legislative debate assist in revealing the legislative intent behind a statute when examined in the context of the debate in its entirety. *Morel*, 117 Ill. 2d at 24.

During the House debate on Senate Bill 1377, later enacted as the Illinois Human Rights Act (Pub. Act 81—1216, eff. July 1, 1980), Representative Harry Leinenweber questioned the House sponsor of the bill, Representative James Reilly, in pertinent part, as follows:

"Leinenweber: 'All right. The Bill also provides, among other things, that considering someone's marital status would be an illegal act of discrimination. Is that correct?'

Reilly: 'Yes.'

Leinenweber: 'All right, and that...and, as I understand it, marital status is a...is defined as married, single, or divorced. Is that correct?'

Reilly: 'Yes.'

Leinenweber: 'Would that include two unmarried adults, female and male, living together, or two unmarried males, or two unmarried females, who are homosexuals, living together?'

Reilly: 'No, it has nothing to do with that at all.'

Leinenweber: 'Well, why would that be excluded from the definition of marital status of married, single, or divorced?'

Reilly: 'Probably why it would be excluded, that is those people are not married, or unmarried, or anything else. It's defined as the legal status of being married, or not married, or divorced, widowed, whatever. The people you're talking about simply don't fall into that category at all.' " 81st Ill. Gen. Assem., House Proceedings, June 25, 1979, at 82-83.

I believe that the above-quoted discussion clearly shows that the term "marital status" as set forth in section 1—103(Q) and defined in section 1—103(J) of the Act does not include the relationship of unmarried persons living together. Consequently, plaintiffs are not protected under the Act, and the judgment of the circuit court should be reversed.