MARY ANN HOUGH, Plaintiff-Appellee, v. GAIL WEBER *et al.*, Defendants-Appellants.

Second District    No. 2—90—0508

Opinion filed August 30, 1990.

Jack C. Slingerland, of Gallagher, Klein & Brady, of De Kalb, for appellants.

Paul E. Gaziano, of Rockford, for appellee.

JUSTICE INGLIS delivered the opinion of the court:

Plaintiff, Mary Ann Hough, filed suit to prevent the disinterment of the remains of her husband, John W. Hough. The disinterment was being sought by the husband's adult children, defendants Gail Weber, Earl Hough, and Holly Hough. The Winnebago County Health Department and Joseph Orthoefer in his capacity as local registrar and public health administrator were also named as defendants. After a hearing, the trial court issued a preliminary injunction enjoining the defending children from seeking the disinterment of John Hough's remains and also enjoining Orthoefer and the Health Department from issuing a permit authorizing the disinterment of his remains. Thereafter, defendant children filed a motion for rehearing and a motion to preserve the evidence, both of which were denied. The children timely appeal raising the following issues: (1) whether defendants' right to due process of law was violated when the trial court granted a preliminary injunction rather than a temporary injunction; (2) whether plaintiff's complaint was insufficient as a matter of law to justify the exercise of the extraordinary remedy of injunctive relief; (3) whether plaintiff sustained her burden of proof at the hearing as to the elements necessary to prove entitlement to in-

junctive relief; and (4) whether the trial court erred in denying defendant's motion to preserve evidence. We affirm.

On August 13, 1989, at 3:11 p.m, John W. Hough, a 63-year-old man, died at SwedishAmerican Hospital in Rockford, Illinois. An autopsy was requested by the Winnebago County coroner's office and the family of the deceased. Dr. Robert Carlovsky performed the autopsy the following day on August 14, 1989. According to his report, John Hough's wife, Mary Ann, had claimed that John had been working out in the yard on the day of his death. At approximately 12:45 p.m. he reportedly came in to eat lunch and was feeling fine. At about 2 p.m., Mary Ann found him lying on the kitchen floor, unresponsive. The paramedics were called and resuscitative measures were initiated. John was transported to the hospital where a "code blue" continued; however, he did not respond and was pronounced dead at 3:11 p.m. John's blood alcohol at the time of death was .253%.

The autopsy performed by Dr. Carlovsky revealed that John had bruises on his legs and his forehead. Several of his posterior and anterior ribs were fractured; one of the broken ribs was pushed into his lung causing the lung to deflate. John's liver had a large laceration measuring 8 by 12 centimeters and approximately 3 centimeters deep. Dr. Carlovsky concluded that in his opinion John Hough died of complications secondary to his fractured ribs with perforation of the right lung and laceration of the liver. He commented that, secondarily, John had hemopneumothorax and hemoperitoneum. Carlovsky opined that the injuries from which John suffered were consistent with a fall.

John Hough's mortal remains were buried at Greenwood Cemetery in Rockford, Illinois, in August 1989. On September 1, 1989, defendant Gail Weber contacted the chief deputy coroner for Winnebago County, Ronald A. Canode, about some questions she had regarding her father's death. A follow-up investigation was then initiated. The paramedics that were at the scene told Canode that John Hough was found clothed wearing only a pair of pajama bottoms, the top of which was down around the knee area and both his legs were in a single pajama leg. Canode stated that John was conscious when the paramedics arrived. The paramedics asked John what his problem was, and he responded that he was having problems breathing but that he did not have any pain. His condition then rapidly deteriorated.

Ronald Canode contacted the Rockford police department on September 14, 1989, requesting them to accompany him back to the

Hough residence to speak to John's wife. When being questioned, Mary Ann stated that she could not recall anything unusual about her husband's dress at the time of the incident. She admitted that she had been drinking the day of his death, but no testing was done as to what extent. She claimed that John had made several trips up and down the basement stairs, which are located adjacent to the kitchen area. These stairs have a thin carpeting material on them, and there is a handrail on one side. Mary Ann claimed that at approximately noon, John was in the kitchen and she had talked to him. She left the kitchen to go to another part of the house and upon returning found John on the kitchen floor. John complained about his difficulty breathing, and Mary Ann called the paramedics. She reported that after returning from the hospital, she found a broken glass at the bottom of the stairs along with a rug that was normally in the kitchen entranceway at the top of the stairs.

Canode reported that John maintained an alcoholic beverage bottle downstairs in the basement located in the ceiling on top of a rafter. Canode stated that John would go at intervals down to the basement and partake of the hidden alcohol.

Secondary opinions were sought. Dr. L.W. Blum, a forensic pathologist from Elgin, Illinois, opined that John Hough suffered a fall down the stairs leading from the kitchen to the basement. Dr. Blum found the injury pattern to be consistent with the mechanism of a fall. He opined that John "could have climbed up the stairs after sustaining the above noted injuries, where becoming weak and apparently confused, he collapsed to the kitchen floor, where he, complaining of shortness of breath, was subsequently discovered by his wife." Dr. Blum concluded that it was unlikely that the injuries were received from a beating due to their location, size and general appearance. He stated, "[t]he lack of defensive wounds, lack of patterned injuries ***, lack of significant internal injuries in different regions of the body, and lack of a statement by Mr. Hough to the first medical responders other than a complaint of being short of breath, render an opinion of death by a beating tenuous and speculative."

Dr. Thomas T. Noguchi, a forensic pathologist from Pasadena, California, opined that the laceration of the liver was caused by a "massive blunt force" which could not be attained by bumping up against a table or kitchen appliance. He stated that the force "requires greater speed and a mass of the weight." Dr. Noguchi explained "this type of massive injury to the liver is usually seen in cases of automobile vs. pedestrian accident or a fall from a greater hight [sic]. In some instances, the force could be delivered from kick-

ing or stumping [*sic*] while the victim is laying [*sic*] on the ground." Noguchi stated that photographs of the scene reveal no object which would protrude or be strong enough to cause injuries of crushing force as described in the autopsy report. Because severe crushing injury would be unlikely, Noguchi ruled out a fall down the stairs as the cause of injury. Noguchi noted the color of one of the bruises found on John indicated that it was at least a few hours old; thus, the doctor concluded that the crushing injury must have occurred a few hours prior to John being found on the kitchen floor.

Dr. Carley C. Ward, a biodynamic engineer from Pacific Palisades, California, opined that Mr. Hough could not have received the injuries from a fall down the basement stairs. Dr. Ward explained, "[s]uch a fall would have resulted in shoulder and hip contacts, not a single direct blow. There would not have been sufficient force to cause concentrated bruising in the lumbar area. In addition, the stairs were carpeted, and his body showed no evidence of rug burns." Dr. Ward concluded that "Mr. Hough's injuries are consistent with a fall from a second story or multiple heavy blows to the body, as in a beating. It is clear that the posterior rib fractures and the bruised trunk with the liver laceration were two separate contacts."

An inquest was held on December 6, 1989. The jury was given the letters containing the above opinions. In addition, Rich McLaughlin, the Winnebago County deputy coroner, was the first to testify. He stated that he was notified on August 13, 1989, at 3:30 p.m. by the emergency room supervisor at SwedishAmerican Hospital. McLaughlin was informed that there were some suspicious bruises on John's body. McLaughlin then talked with Mary Ann Hough. She told McLaughlin that she was not sure how John got the bruises. She said that John had been working out in the yard, that he came in for dinner and went downstairs to get a hammer and nails to put up some pictures or a plaque. Mary Ann said that she went in one of the front bedrooms of the house and, when she returned, she found John on the kitchen floor. He complained of troubled breathing, and she called the paramedics.

McLaughlin testified that after a blood sample was taken, he transported John's body to the morgue so that Dr. Carlovsky could perform the autopsy.

Dr. Carlovsky then testified to the findings he made from the autopsy and that his conclusion was that "this man had fallen and basically that he had fractured his ribs, the ribs perforated the lung, and when the lung perforated, it created a pneumothorax on that side. And he had some bleeding from those fractures, he had some bleed-

ing from the liver, and basically he went into cardiac arrest, and he died." Carlovsky opined that the injuries from which John suffered were the result of a single impact.

Ronald A. Canode, the chief deputy coroner for Winnebago County, was the next witness to testify. He testified that he was contacted by defendant Gail Weber and that the follow-up examination then ensued. Canode noted several inconsistencies in the paramedic's report, namely, whether John was able to speak when the paramedics arrived; what was the Glasgow coma scale rating of John's health condition when the paramedics arrived; on which hip was his large bruise located; and which direction John's body was facing when it was found. However, Canode testified:

> "We were able to determine the victim's position at the time of the paramedics' arrival, which was with his feet toward the stove and his head toward the living room. He was conscious at the time of the arrival of the paramedics and then lapsed into unconsciousness. The amount of time between then and until he was declared brain dead appeared appropriate in this incident."

Canode noted that they did not find an explanation for John's inappropriate dress at the time of the incident and "were unable to determine the relatively [sic] of that to this incident or anything of that nature." They were further unable to determine why the rug, normally located in the kitchen entranceway, was at the bottom of the stairs.

Defendant Gail Weber then testified that her father was an alcoholic, but he was a "very functional alcoholic" in that he always appeared normal and was never drunk. She stated that she never even saw her father take the garbage out without having his shoes and socks on and opined that "[t]he idea of his working out in the yard in his pajamas is ludicrous." She found it unbelievable that her father would keep a bottle of alcohol on a rafter in the basement because her father "had absolutely no compunction about letting anyone know who cared to know that if he wanted to have a beer, he was going to have a beer whether you liked it or not."

Weber explained that she moved away from Rockford 20 years ago, but she had visited her father two years ago. Mary Ann Hough is John's Hough's second wife; his first marriage ended in divorce. John and Mary Ann had been married for five years. Two years prior to his death, John retired from Ingersoll Milling Machine.

After the conclusion of the hearing, the jury returned a verdict finding that John Hough came to his death by accidental means.

On February 9, 1990, defendant Gail Weber signed an application for disinterment of the remains of John Hough. On February 19, 1990, Joseph Orthoefer, the local public health administrator, issued a disinterment permit to Olson's Mortuary in Rockford allowing the disinterment. (See Ill. Rev. Stat. 1989, ch. 111½, par. 73—21(5).) On Friday, March 2, 1990, Mary Ann Hough filed a complaint seeking "preliminary" and "permanent" injunctive relief to prevent defendants Gail Weber, Earl Hough and Holly Hough from causing the disinterment of their father's remains and seeking to enjoin the local health administrator from issuing a disinterment permit. That same day, plaintiff's attorney notified defendants' attorney that plaintiff was to appear in Winnebago circuit court on Monday, March 5, 1990, to obtain a date for "hearing on the temporary injunction."

On March 5, plaintiff's attorney appeared before the trial court and, in explaining the nature of the action to the court, stated that their purpose was to obtain a date for "hearing on temporary injunctive relief." The court granted the request for a hearing date, setting the matter for Wednesday, March 7, 1990.

Plaintiff's attorney notified defendants by mail that a hearing on the "preliminary injunction" would take place on March 7, 1990. In addition, defendants were issued subpoenas for the March 7 hearing. Defendants Winnebago County Health Department and Joseph Orthoefer filed an answer to the complaint on March 6, 1990. No answer was filed by the defending children.

At the March 7 hearing, plaintiff's attorney opened by stating, "[t]he purpose for being here today is to obtain a temporary injunction prohibiting Dr. Orthoefer from issuing a permit allowing disinterment and from temporarily prohibiting Mrs. Weber and Earl Hough and Holly Hough from seeking to carry out a disinterment pending final hearing on [the] merits." When plaintiff attempted to call the first witness, defendants objected, arguing that testimonial evidence is not relevant at a hearing for a temporary restraining order. Rather than having the first witness testify, plaintiff's attorney admitted certain documents in her stead, namely, the certificate of death; the report of proceedings from the inquest; and the coroner's records, which included the verdict form from the inquest and the reports of Drs. Carlovsky, Blum, Noguchi, and Ward.

Plaintiff's attorney then called Sergeant Dominic Iasparro of the Rockford police department without objection. Iasparro testified that the police did not start to investigate the death of John Hough until September 14, 1989, when contacted by Ron Canode of the coroner's office. Iasparro stated that after reviewing the records and medical

opinions and after speaking with the investigators and the defending children, it was his opinion that John Hough died as a result of an accident in the home. Iasparro stated, "I personally don't feel that any additional medical opinion about the size, shape of the wound is going to change my opinion concerning how the incident took place." Iasparro explained that new physical evidence would only be of interest to him if it was directed toward motive or a suspect. Absent motive or suspect, and in spite of the conflicting medical opinions, Iasparro maintained that the death was accidental, and the police investigation was concluded.

Plaintiff's counsel then rested stating, "[W]e present no further testimony on the temporary issue." During arguments, counsel for defendants explained that if the disinterment were allowed, Dr. Noguchi would perform various tests including a computer-assisted tomography of the body, a radiographic documentation of the body, a photographic documentation of the body, and a microscopic examination of the skin's surface. By performing a microscopic examination of the skin over the wounded hip area, Dr. Noguchi hoped to find some indication as to what caused the injury.

Plaintiff's counsel argued that there had been no presentation of a clear and convincing need to disinter the body and that plaintiff's petition for temporary relief ought to be granted and the disinterment prohibited. The hearing was then concluded.

Thereafter, on March 9, 1990, the trial judge held, "there is no strong and convincing evidence to show that there is a reason to disinter the body. From what I can see, really there is nothing more to be gained from doing that." The judge then stated that he was entering a permanent injunction enjoining defendant children from seeking the disinterment of their father. Counsel for defendants objected, arguing that the hearing held on March 7 was for a temporary restraining order, not for a permanent injunction. Defendants argued that they "would have the right to have Dr. Noguchi appear before the Court and explain in greater detail the basis of his finding as well as the—his opinions of the coroners' and the pathologists' findings." Defendants claimed that they were notified that the order to be entered would be merely temporary. The trial judge then held that a preliminary injunction should issue. An order to that effect was filed April 17, 1990.

On May 11, 1990, defendants filed a motion for rehearing and a motion to preserve evidence. A hearing on the motions was held May 14, 1990. As to the rehearing, defendants argued that they were prejudiced by their inability to offer affirmative evidence to contra-

dict the offerings made by Mary Ann at the hearing. Defendants maintained that their inability to offer evidence resulted from written and oral representations by plaintiff's counsel that plaintiff was seeking merely a temporary order to maintain the status quo. In support of their argument as to the type of evidence missing, defendants submitted a statement from Dr. Thomas Noguchi wherein the need and reasons for the second autopsy were explained. Dr. Noguchi explained the key information that was lacking and needed. The doctor stated that a new technology is available for detail documentation called computed tomography, which is a type of X-ray procedure that "can precisely locate the tissue and bony damages by X-ray beam sectioning the body without destroying the tissue ***. The recording of a CT scan can be studied for three-dimensional image and can be reconstructed for more detail[ed] analysis at a later time." As a result of the second autopsy, Dr. Noguchi hoped to discover the type of force involved and the sequence of events leading to John Hough's death.

After hearing arguments on the motion for rehearing, the trial court denied the motion. The court then heard arguments on the motion to preserve evidence. Again, a statement by Dr. Noguchi was submitted in support of the motion. Dr. Noguchi opined that the type of burial vault and casket which hold the remains of John Hough is poorly suited for protection from deterioration. Noguchi recommended that to assure that the remains do not deteriorate at an increasing rate, John's body should be disinterred and reburied in a manner so as to allow maximum protection against the elements of deterioration. The trial court denied the motion, and defendant children appeal. No appeal was filed by Joseph Orthoefer or the Winnebago County Health Department.

■ The first issue raised by defendants is whether their right to due process of law was violated when the trial court granted a preliminary injunction rather than a temporary injunction. In her complaint, plaintiff sought a "preliminary" and a "permanent" injunction. The first notice sent to defendants referred to the relief sought as a "temporary injunction;" the second notice referred to it as a "preliminary injunction." Thereafter, plaintiff's counsel referred to the issue at bar in the following manners: "temporary injunction," "temporary issue," "temporary order," and "temporary relief."

While it is true, as defendants point out, that there is no statutory provision for a temporary injunction (see Ill. Rev. Stat. 1989, ch. 110, pars. 11—101, 11—102), Illinois courts have referred to the terms "temporary injunction" and "preliminary injunction" inter-

changeably. (See, *e.g., Kurle v. Evangelical Hospital Association* (1980), 89 Ill. App. 3d 45, 47-48; *H.K.H. Development Corp. v. Metropolitan Sanitary District* (1964), 47 Ill. App. 2d 46, 51-52.) Here, plaintiff was clearly seeking a preliminary injunction, not a temporary restraining order, and it was a preliminary injunction which the trial court ultimately granted. Because defendants were notified of the hearing on the injunction issue, we find that there was no violation of their due process rights.

■ Next, defendants allege that plaintiff's complaint was insufficient as a matter of law to justify the exercise of the extraordinary remedy of injunctive relief. A preliminary injunction is a provisional remedy granted to preserve the status quo. (*Ron Smith Trucking, Inc. v. Jackson* (1990), 196 Ill. App. 3d 59, 63.) Because a preliminary injunction is an extraordinary remedy, it should be granted only pursuant to the utmost care and should not issue unless the need is clear. (*Gold v. Ziff Communications Co.* (1989), 196 Ill. App. 3d 425, 430.) In order to establish entitlement to preliminary injunctive relief, the plaintiff must demonstrate that: (1) she possesses a certain and clearly ascertained right which needs protection; (2) she will suffer irreparable harm without the protection of an injunction; (3) there is no adequate remedy at law for her injuries; (4) there is a substantial likelihood of success on the merits; and (5) in the absence of preliminary relief, she would suffer greater harm without the injunction than defendants will suffer if it is issued. (*Mister v. A.R.K. Partnership* (1990), 197 Ill. App. 3d 105, 110-11.) A complaint for preliminary injunction must plead facts which clearly establish a right to injunctive relief, and allegations consisting of mere opinion, conclusion or belief are not sufficient to support issuance of the writ. *Village of Lake in the Hills v. Laidlaw Waste Systems, Inc.* (1986), 143 Ill. App. 3d 285, 291.

■ Plaintiff initially argues that defendants may not attack the sufficiency of the complaint because they failed to raise the issue below and thus it is waived. (See Ill. Rev. Stat. 1989, ch. 110, par. 2—612(c).) A review of the case law indicates that the waiver rule does not apply to the review of a complaint seeking preliminary injunction (*Laidlaw Waste Systems*, 143 Ill. App. 3d at 291; *Glen Ellyn Savings & Loan Association v. Tsoumas* (1976), 41 Ill. App. 3d 292, 294), especially in the case where an answer has not been filed. (See *Williams v. Northwestern University* (1986), 147 Ill. App. 3d 374, 377.) In *Laidlaw Waste Systems*, this court held that while a reviewing court will not reach the merits of the case in an interlocutory appeal, it will determine whether the trial court had a discretionary right to

issue the preliminary injunction and whether the complaint was sufficient to sustain it. *Laidlaw*, 143 Ill. App. 3d at 291.

Thus, we must first look to the sufficiency of plaintiff's complaint in determining the propriety of the preliminary injunction granted. Defendants raise four issues as to the sufficiency of plaintiff's complaint: (1) whether plaintiff possesses a protectable interest; (2) whether plaintiff will suffer irreparable harm; (3) whether there is an adequate remedy at law; and (4) whether the verification of the complaint was insufficient to support the injunction.

■ First, we consider plaintiff's interest. In order to be granted a preliminary injunction, plaintiff must have standing in the cause, which requires a showing of a clearly ascertainable right or interest which needs protection. (*Laidlaw Waste Systems*, 143 Ill. App. 3d at 292.) In the context of a complaint for injunctive relief, the doctrine of standing "makes it necessary for a party seeking such relief to allege an injury in fact to some substantive interest he possesses which is recognized by statute or common law." (*Laidlaw Waste Systems*, 143 Ill. App. 3d at 292.) The doctrine is designed to insure that the courts are accessible to resolve actual controversies between parties and not address abstract questions, moot issues, or cases brought on behalf of others who may not desire judicial aid. *Jenner v. Wissore* (1988), 164 Ill. App. 3d 259, 267.

■ In her complaint, plaintiff simply alleges that she is the surviving spouse of John Hough. Defendants argue that a mere allegation of marital status is insufficient for purposes of standing. We disagree. The substantive interest of plaintiff as wife of the decedent is recognized in common law. The appellate court has held:

> "It is generally conceded that on the death of a husband or wife the primary and paramount right to the possession of the body and to the control of the burial or other legal disposition thereof is in the surviving spouse and not in the next of kin, in the absence of a different provision by the deceased." (*In re Estate of Fischer* (1954), 1 Ill. App. 2d 528, 533.)

(See also 22A Am. Jur. 2d *Dead Bodies* §86 (1988); 16 Ill. L. & Prac. *Death* §72 (1971).) While a person's interest in a body is lessened once it is buried (*Hicks v. Stehl* (1986), 149 Ill. App. 3d 1034, 1035), there is no authority to suggest that mere burial eradicates all interests entirely. Thus, we find that plaintiff's status as a spouse does, in fact, provide her with a protectable interest. Whether plaintiff's interest is strong enough to prevent disinterment goes to the merits of the case, not to whether plaintiff has standing.

■ While plaintiff has a recognized substantive interest, she

must allege an irreparable injury to prevail on a preliminary injunction. The injury to plaintiff must be in the form of her legal rights being sacrificed if she is forced to await a decision on the merits. (*Illinois Federation of Teachers v. Board of Trustees* (1989), 191 Ill. App. 3d 769, 772.) In her complaint, plaintiff alleges that "defendant Gail Weber signed an application for disinterment of the remains of John W. Hough," "[t]hat no circumstances exist which justify the removal of the mortal remains of John W. Hough from its present place of burial," and "[t]hat plaintiff believes that unless defendants *** are restrained by injunction *** the mortal remains of John W. Hough will be disintered [*sic*]." Plaintiff concludes that the disinterment of John's remains will cause her to be irreparably injured. A review of plaintiff's complaint indicates that she sufficiently alleged irreparable harm. Without the injunction, the disinterment was sure to proceed, thus making plaintiff's injury actual and imminent. (See *Heerey v. Berke* (1989), 179 Ill. App. 3d 927, 941.) We do not find plaintiff's fears and apprehensions to be unfounded (see *Arnold v. Engelbrecht* (1987), 164 Ill. App. 3d 704, 709), although they must certainly be difficult to place into words for purposes of a complaint.

Defendants' citation to *Mingare v. DeVito* (1978), 67 Ill. App. 3d 371, is unpersuasive. In *Mingare*, the plaintiffs, who were patients in State mental institutions, sought to enjoin the Department of Mental Health and Developmental Disabilities from dismissing all of its limited licensed doctors. In their complaint, plaintiffs alleged "[t]hat the medical care for the plaintiffs must suffer as the logical result of the drastic and dangerous reduction of the number of persons capable of extending care." (*Mingare*, 67 Ill. App. 3d at 373.) The trial court dismissed the complaint as fatally defective for failure to establish that irreparable harm would result if the preliminary injunction were not granted. The appellate court affirmed, finding that the complaint did not show a real and immediate danger and that the allegation was completely conjectural. In contrast, plaintiff's allegations in the instant case are not conjectural as it is certain that if the preliminary injunction had not issued and her deceased husband's remains were exhumed from their final resting place, transported to another State, and submitted to further analysis, her legal rights would be irreparably harmed. The possibility of her suffering is real and imminent, and thus the matter is ripe for a preliminary injunction.

Next, we consider defendants' claim that plaintiff has an adequate remedy at law. Defendants first contend that the bare allegation in plaintiff's complaint that she has no adequate remedy at law is insufficient for injunctive purposes when not supported by factual

allegations. However, it is clear that when the complaint is read as a whole, plaintiff's lack of an adequate remedy at law is founded on her claim of "great mental anguish and suffering."

Defendants argue that, even if the allegations in plaintiff's complaint are supported, damages resulting from such a claim can be compensated for monetarily as demonstrated by the recognition of the tort of intentional infliction of emotional distress. Under this tort a plaintiff may sue for damages caused by a defendant's actions with regard to a decedent's body. See *Koeller v. Cook County* (1989), 180 Ill. App. 3d 425, 434; *Hearon v. City of Chicago* (1987), 157 Ill. App. 3d 633, 635.

■ A review of defendants' argument as to monetary damages indicates that it is flawed in several respects. First, it is unclear whether plaintiff's injury could be monetarily compensated under the tort of intentional infliction of emotional distress. To recover under such a tort, plaintiff must show that (1) defendants' conduct is so outrageous in character and so extreme in nature as to go beyond all possible bounds of decency; (2) the emotional distress from which plaintiff suffers is so severe that no reasonable person could be expected to endure it; and (3) despite a high probability that such severe emotional distress will follow, defendants went ahead with the conduct in conscious disregard of that probability. (*Koeller*, 180 Ill. App. 3d at 434; *Hearon*, 157 Ill. App. 3d at 635.) As demonstrated by the holdings in *Koeller* and *Hearon*, these are difficult elements to prove; in both cases it was held that the plaintiff failed to state a cause of action for intentional infliction of emotional distress.

■ Even if monetary damages were available to plaintiff through such a cause of action, that does not negate the possibility of injunctive relief. To be an adequate remedy at law which will deprive equity of its power to grant injunctive relief, the remedy must be concise, complete, and provide the same practical and efficient resolution as the equitable remedy would provide. (*Diamond Savings & Loan Co. v. Royal Glen Condominium Association* (1988), 173 Ill. App. 3d 431, 435; *Board of Managers of Village Square I Condominium Association v. Amalgamated Trust & Savings Bank* (1986), 144 Ill. App. 3d 522, 529.) Further, a preliminary injunction may be granted when damages are difficult to quantify at the time of the hearing. (*Eagle Books, Inc. v. Jones* (1985), 130 Ill. App. 3d 407, 411.) Certainly in the case at bar, plaintiff's damages are difficult to quantify. In addition, a remedy at law would not provide the same practical and efficient resolution as would a preliminary injunction. Plaintiff sought temporarily to enjoin defendants from removing the

body of John Hough from its final resting place until a hearing on the merits could be held. A money judgment would not have provided similar relief.

■ Next, we turn to defendants' argument that plaintiff's complaint was improperly verified and thus could not support the issuance of injunctive relief. Defendants cite no authority in support of this argument. This court has held that contentions unsupported by citation of relevant authority as required by Supreme Court Rule 341 (113 Ill. 2d R. 341(e)(7)) merit no consideration. (*Logan v. West Coast Cycle Supply Co.* (1990), 197 Ill. App. 3d 185, 190-91.) Even if we were to consider defendants' argument, it would seem to be without merit as defendants were notified of the complaint seeking preliminary injunction. This court has held that verified pleadings are not required where a preliminary injunction is sought upon notice. *County of Lake v. X-Po Security Police Service, Inc.* (1975), 27 Ill. App. 3d 750, 756.

Defendants next contend that, even if plaintiff's complaint was legally sufficient, she did not sustain the proper burden of proof at the hearing as to the elements necessary to prove entitlement to injunctive relief. In this regard defendants raise the following issues: (1) whether plaintiff sufficiently proved that she would suffer irreparable harm without the protection of an injunction; and (2) whether plaintiff sufficiently proved a substantial likelihood of success on the merits.

■ We initially note that the decision whether to grant a preliminary injunction rests within the trial court's broad discretionary powers, and appellate review of the court's order is limited to a determination of whether the court has abused its discretion. (*Mister*, 197 Ill. App. 3d at 111.) In making such a determination, the reviewing court is to determine whether the trial court's findings are contrary to the manifest weight of the evidence. (*Jackson*, 196 Ill. App. 3d at 63.) It must be remembered that a preliminary injunction does not anticipate or depend upon the ultimate conclusion of the cause; rather, the granting of a preliminary injunction shows only that a sufficient case has been presented to preserve the property or rights in issue until a final hearing on the merits can be held. *Gold*, 196 Ill. App. 3d at 431.

■ We first address defendants' contention that a showing of irreparable harm had not been made. At the hearing on the motion to enter the trial court's order for preliminary injunction, defendants objected on the basis that there was no evidence introduced to support the findings. In response, the trial judge cited to the prelimi-

nary injunction statute (Ill. Rev. Stat. 1989, ch. 110, par. 11—102) and stated that a finding of irreparable injury and inadequate remedy at law is "implicit in this case." The judge explained:

"[I]f we didn't issue the injunction, and if they issued a little permit, and then the body was disinterred, you have no way you could reverse that. There is your irreparable injury. It happens.

This type of thing is the same thing, with no adequate remedy at law. Money can't compensate you for that type of problem, that type of thing."

On appeal, defendants argue that by invoking this "unfounded presumption" as to irreparable injury, the trial court failed to require plaintiff to produce evidence on each of the elements necessary to the issuance of injunctive relief and thereby committed error. *Kanter & Eisenberg v. Madison Associates* (1987), 116 Ill. 2d 506, 516; *People ex rel. Fahner v. Steel Container Corp.* (1981), 102 Ill. App. 3d 369, 373.

We disagree. Our supreme court in *Kanter* explained that "[a] court faced with a request for temporary injunctive relief must first consider whether the plaintiff will sustain irreparable harm by waiting for a decision on the merits." (*Kanter*, 116 Ill. 2d at 510.) Thus, as we have stated above, it is not a question of whether plaintiff will ultimately be harmed by the disinterment of her deceased husband's remains; rather, the question is whether plaintiff's interest will be irreparably harmed if the status quo is not preserved until a hearing on the merits can be had. (*Illinois Federation of Teachers*, 191 Ill. App. 3d at 772; *Sports Unlimited, Inc. v. Scotch & Sirloin of Woodfield, Inc.* (1978), 58 Ill. App. 3d 579, 582.) Here, the record reveals that plaintiff's interest is in keeping the remains of her husband undisturbed. If the trial court were to deny the preliminary injunction, a permit for disinterment would likely issue as demonstrated by the previously issued permit, plaintiff's interest would thereby be irreparably harmed and her damages uncompensable. Thus, we do not view the trial court's finding as to irreparable harm as being based upon "inferential leaps of logic" and unsupported by the record as defendants argue. (See *Steel Container Corp.*, 102 Ill. App. 3d at 373.) Accordingly, we do not find it to be against the manifest weight of the evidence. *Jackson*, 196 Ill. App. 3d at 63.

■■■ Next, we consider defendants' contention that plaintiff did not demonstrate a likelihood of success on the merits. In order to obtain preliminary relief, plaintiff must establish a likelihood of success on the merits of her underlying action. While plaintiff is not required

to make out a case that would entitle her to relief on the merits, she needs to establish that she raises a "fair question" about the existence of her right and that the court should preserve the status quo until the case can be decided on the merits. *Mister*, 197 Ill. App. 3d at 111.

■■ It is the policy of Illinois law that the sanctity of the grave should be maintained and that a body once suitably buried should remain undisturbed, except in cases of necessity or for laudable purposes. (16 Ill. L. & Prac. *Death* §75 (1971).) Disinterment is not a matter of right, and ordinarily a court will not order or permit a body to be disinterred against the will of those who have a right to object except upon strong and convincing evidence of new and unforeseen events occurring since the burial showing that it would be unreasonable to refuse the removal. (*Stehl*, 149 Ill. App. 3d at 1035-36.) Where the aid of chancery is invoked to authorize the disinterment of a dead body, due regard will be given to the interests of the public, the wishes of the decedent, and the rights and feelings of those entitled to be heard by reason of relationship or association. 16 Ill. L. & Prac. *Death* §75 (1971).

■■ In the case at bar, defendants first argue that plaintiff did not establish a likelihood of success on the merits as demonstrated by the failure of the trial court specifically to announce orally or in his written order such a finding. We disagree. In fact, the trial judge initially ruled in favor of plaintiff on the merits, granting her a permanent injunction. The judge stated:

"Basically the Court finds in this case there is no strong and convincing evidence to show that there is a reason to disinter the body. From what I can see, really there is nothing more to be gained from doing that. And in addition, that there is no public necessity to disinter for gathering additional evidence in this—any further investigation.

Therefore, the Court finds the issue in favor of the plaintiff against the defendants and the Court will issue a permanent injunction."

Later, the trial judge changed his ruling to a preliminary injunction when it was pointed out by defendants that while the complaint prayed for a preliminary and permanent injunction, all notices specified that a preliminary injunction was being sought. Thus, it is clear that if the trial court was willing to grant a permanent injunction, it found that plaintiff had sustained her burden of proof as to the likelihood of success on the merits.

■■ In the alternative, defendants argue that if the trial court

did make such a finding as to the likelihood of success, it was against the manifest weight of the evidence. The evidence produced at the hearing included: (1) the autopsy report of Dr. Carlovsky, who concluded that injuries suffered by John Hough were the result of a fall; (2) the opinion of Dr. Blum that John suffered a fall down the stairs leading from the kitchen to the basement; (3) the opinion of Dr. Noguchi that John did not fall down the stairs, rather his injuries resembled an "automobile vs. pedestrian accident or a fall from a greater hight [sic]" or "from kicking or stumping [sic] while the victim is laying [sic] on the ground"; (4) the opinion of a biodynamic engineer that John did not fall down the stairs, rather his injuries were consistent "with a fall from a second story or multiple heavy blows to the body, as in a beating"; (5) a transcript of proceedings from the coroner's inquest; (6) the coroner's jury verdict that John died of accidental means; (7) the death certificate of John; and (8) the testimony of Rockford police sergeant Dominic Iasparro that, absent motive or suspect, no additional medical opinion would change his mind that the death was accidental. The only additional information provided that was not provided at the inquest was a statement by Dr. Noguchi explaining what additional information he hoped to seek from a second autopsy, and this statement was not provided until defendants argued their petition for rehearing.

From our review of the record, it appears that plaintiff sufficiently proved the absence of "strong and convincing evidence of new and unforeseen events" (see *Hicks*, 149 Ill. App. 3d at 1036) so as to warrant a preliminary injunction. Contrary to defendants' argument, this is the proper standard of proof.

As to burden of proof, defendants make another argument. They claim that it was improper to issue a preliminary injunction enjoining defendant Joseph Orthoefer, his successors, and defendant Winnebago County Health Department from issuing a permit authorizing the disinterment of the remains of John W. Hough. Defendants initially argue that because a disinterment permit was issued, in order to enjoin its effect, plaintiff was required to show that Orthoefer's act in issuing the permit was induced by fraud or corruption. (*Illinois Federation of Teachers*, 191 Ill. App. 3d at 773.) However, a review of the record indicates that while a permit was issued, it was later apparently cancelled. Defendants argue that nonetheless the preliminary injunction issued against Orthoefer and the health department interferes with the official acts of the health official absent a showing that such acts are unlawful. We note that defendants Orthoefer and the health department have not appealed the injunc-

tion issued against them. We find that we need not consider the propriety of their injunction as it will not affect the outcome of this appeal. The preliminary injunction ordered by the trial court enjoined, in part, the defending children from directly or indirectly seeking the disinterment of John Hough's remains. A review of plaintiff's complaint and proofs offered at the hearing indicates that she sufficiently proved the need for the preliminary injunction to issue as against the defending children. In so ordering, we do not find that the trial court abused its discretion. When a hearing is held on the merits, defendants will have a full opportunity to present their evidence.

■■■ Finally, we consider defendants' argument that the trial court erred in denying their motion to preserve the evidence. Defendants contend that their motion was supported by an "affidavit" of an experienced forensic pathologist, Dr. Thomas Noguchi, stating that preservation of the body was necessary to enhance the evidentiary value of any future analysis upon the decedent's remains. The so-called "affidavit" was titled as such, signed by Dr. Noguchi, and had a declaration stating that the information given was "upon oath." However, there is no evidence that the statement was sworn to before any officer or was notarized; therefore, the statement must fail as an affidavit. (*Kohls v. Maryland Casualty Co.* (1986), 144 Ill. App. 3d 642, 645; *People v. Smith* (1974), 22 Ill. App. 3d 377, 380.) Further, because the statement was apparently given in California, it must appear that the affidavit was sworn to before an officer authorized to administer oaths, and if not the affidavit is a nullity. (Ill. Rev. Stat. 1989, ch. 101, par. 6; *Keefer v. Mason* (1865), 36 Ill. 406, 408.) Thus, because there was no competent evidence indicating that the evidence needed to be preserved, we affirm the trial court's denial of the motion.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

WOODWARD and DUNN, JJ., concur.