(No. 76160.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. EUGENE McDANIEL, Appellant.

*Opinion filed February 17, 1995.*

174

Donald Hubert & Associates, of Chicago (Donald Hubert and Andre S. LaBerge, of counsel), for appellant.

Roland W. Burris, Attorney General, of Springfield, and James E. Ryan, State's Attorney, of Wheaton (Norbert J. Goetten, William L. Browers and David A. Bernhard, of the Office of the State's Attorneys Appellate Prosecutor, of Elgin, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

Following a jury trial in the circuit court of Du Page County, the defendant, Eugene McDaniel, was convicted of first degree murder and was sentenced to 60 years' imprisonment. The appellate court affirmed the defendant's conviction and sentence. (249 Ill. App. 3d 621.) We allowed the defendant's petition for leave to appeal (145 Ill. 2d R. 315(a)), and we now affirm the judgment of the appellate court.

Given the nature of the issues raised in the present appeal, the evidence introduced at the defendant's trial may be summarized briefly. A police officer responding to an emergency call placed by the defendant arrived at the defendant's home in Winfield shortly before 1:30 a.m. on May 18, 1990. The officer entered the house and found the defendant's wife, Deborah McDaniel, lying on the bed in the master bedroom, bleeding from her head. In an adjacent bedroom the officer found the couple's young daughter, who was awake and unharmed. No one else was on the premises. The victim was taken by ambulance to Central Du Page Hospital, where she was pronounced dead.

Investigators discovered jewelry, money, and a checkbook strewn on the floor in the master bedroom, and saw that other rooms in the house were in disarray. The passenger-side doors of a family car parked in the garage were open. A number of items were inside the vehicle, including a cassette recorder, a telephone answering machine, a television set, a briefcase, and a bag filled with jewelry and coins; a radio was on the hood of the car.

Investigators saw no evidence of an unauthorized entry to the house, however. The windows were all closed, and the front door was closed and locked. The locks on the front door, on a sliding glass door at the rear of the house, and on the door leading from the garage into the house were intact and did not appear to have been tampered with. The sliding door was open six or seven inches; it led to a backyard patio, and the only footprints found by investigators in the lawn surrounding the patio were the officers' own.

The defendant was employed by United Airlines as a ramp supervisor at O'Hare Airport; he had worked for United for about four years. Before that, he had been employed for eight years as a police officer in Wheaton. At trial, the prosecution introduced evidence of various statements made by the defendant following the discovery of the offense. The defendant told investigators that he arrived home from work, opened the garage door, and saw wires hanging from the family car parked in the garage. The defendant stated that he also noticed that the door leading from the garage to the house was open. The defendant initially said that he entered the house, found his wife, and then ran across the street to use a neighbor's telephone. Later, however, the defendant said that he called the police before entering his home.

The defendant also told officers that he left work around 11:15 or 11:30 p.m. on May 17. He first stopped

for gas at a service station and later stopped at a grocery store to purchase a cup of coffee. The defendant said that he arrived home around 12:30. When investigators pointed out to the defendant the gap in time between his arrival home at 12:30 a.m. and his call for help nearly an hour later, at 1:21 a.m., the defendant acknowledged the discrepancy and said simply that he was unable to explain it.

Later, during further questioning at the hospital, the defendant said that he would help law enforcement officers find the "missing 45 minutes" in his account after he first told family members what had happened. Sometime after that, the defendant left the hospital and went to his house in the company of several officers to change his clothes and to pick up some items for his daughter. There, the defendant assured an assistant State's Attorney that the case would be solved that day. Continuing, the defendant said that he "did it" and would explain why after he had talked to a lawyer. The defendant also said that the gun used in the offense would be found that day.

At trial, the State presented testimony contradicting the defendant's account of his return from work on the night of the murder. Evidence showed that the service station where the defendant said he had stopped for gas closed at 11:30 during May 1990 and did not employ a cashier similar to the description provided by the defendant. A patron of the store where the defendant said he had bought coffee prior to arriving home at 12:30 identified the defendant as being present in the store around 1:09 a.m., much later than the time defendant claimed.

The autopsy evidence disclosed that the victim died as the result of a gunshot wound to the head. Police officers found a five-shot Smith & Wesson handgun under the passenger seat of the defendant's pickup truck. The gun was loaded, and one of the shells had been dis-

charged. Forensic testing showed that the bullet recovered from the victim's body could have been fired from the gun found in the defendant's truck. A Wheaton police officer testified that the gun taken from the truck was the one he had exchanged with the defendant a number of years earlier; the witness was able to identify the weapon by the distinctive orange paint he had placed on the sight.

The State also presented evidence that the defendant's marriage had been troubled. Testifying in behalf of the prosecution, a female United Airlines employee at O'Hare Airport stated that she and the defendant had been engaged in a romantic relationship for several years preceding the death of the defendant's wife. The witness testified that, beginning in January 1990 and continuing to the middle of May, the defendant assured her that he would marry her after he divorced his wife and sold his house.

The defendant did not testify at trial, but defense counsel introduced favorable testimony from a number of character witnesses. In addition, defense counsel presented testimony in support of the theory that the statements made by the defendant to investigators were involuntary.

After the close of evidence, the jury found the defendant guilty of the first degree murder of his wife. Following a hearing, the judge sentenced the defendant to 60 years' imprisonment for the offense. The appellate court affirmed the defendant's conviction and sentence. (249 Ill. App. 3d 621.) The appellate court upheld the trial judge's order denying the defendant's motion to suppress his statements. The appellate court rejected the defendant's remaining allegations of error as well, concluding that the public defenders appointed to represent the defendant following his request for counsel were not ineffective, that certain comments made by the

prosecutor in closing argument were proper and did not constitute grounds for a new trial, and that the defendant's guilt for the charged offense was established beyond a reasonable doubt. We allowed the defendant's petition for leave to appeal (145 Ill. 2d R. 315(a)).

## I

The defendant's principal contention before this court concerns the denial of his motion to suppress the statements he made to law enforcement officers. In the courts below, the defendant raised a number of different challenges to the introduction into evidence of his statements. The trial judge and the appellate court both held that the defendant's statements were not taken in violation of *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, and that the defendant made the statements voluntarily. Before this court, the defendant's argument is much narrower and involves only a single issue: whether the defendant made an effective invocation of his right to counsel while being interrogated at the hospital.

With regard to the contention that law enforcement officers continued to question the defendant even after he requested the assistance of counsel, the trial judge found that the defendant did not request counsel until 1:30 p.m. on May 18 at the sheriff's office, when the defendant asked that the public defender be appointed to represent him, and that all questioning of the defendant then ceased. The appellate court relied on somewhat different grounds in sustaining the trial judge's ruling. The appellate court assumed that the defendant made a request for counsel around 11 a.m. on that day at the hospital, as the defendant claimed, but concluded that the defendant was not in custody until he arrived at the sheriff's office around 1:30 that afternoon. Because the appellate court believed that a suspect may not invoke the *Miranda* rights outside a custodial or coercive set-

ting, the court concluded that the defendant's request for counsel, allegedly made prior to the time the defendant was taken into custody, was ineffective.

Before this court, the defendant argues that a suspect may effectively invoke his right to counsel prior to being taken into custody, and he cites both the Federal and State Constitutions in support of that contention. Alternatively, the defendant argues that he was in custody when he allegedly invoked his right to counsel. The defendant acknowledges that the prerequisite for relief on either his principal argument or his alternative argument is an invocation of the right to counsel and that, without an invocation, both contentions must fail.

Because a court will avoid determining a constitutional question if the case can be resolved on other, nonconstitutional grounds (*In re Estate of Longeway* (1989), 133 Ill. 2d 33, 44; *People v. Vandiver* (1971), 51 Ill. 2d 525, 527-28), we must first determine whether the defendant did in fact make a request for counsel at the time he claims he did.

According to the evidence presented at the suppression hearing, the defendant arrived at the hospital where his wife had been taken around 2 a.m. on May 18. Beginning around 4 a.m., the defendant was questioned by Sergeant William Rizer and Detective Donald Mitchell of the Winfield police department. The questioning took place in the meditation room at the hospital. Later, Detective Dennis Kurzawa of the Du Page County sheriff's office replaced Sergeant Rizer. Around 5:30 a.m., with Kurzawa and Mitchell present, the defendant signed forms consenting to a search of his house and of the pickup truck he was driving that night. Assistant State's Attorney Joseph Birkett entered the room as the defendant was completing the forms and assumed primary responsibility for questioning the defendant.

Birkett, Kurzawa, Mitchell, and the defendant moved to another room in the hospital around 9:30 that morning at the request of the hospital chaplain. According to the State's testimony at the suppression hearing, Birkett advised the defendant of his *Miranda* rights at 9:52, and the defendant waived those rights and continued to respond to questions. Sometime before 11 o'clock, in response to the question why he had committed the offense, the defendant said that he would tell the authorities why but that he first wanted to inform his family. Birkett testified that the defendant also said, " 'Come with me and I will find that missing 45 minutes for you.' " Several of the defendant's family members were brought into the room, and Birkett, Kurzawa, and Mitchell left.

According to Birkett, the defendant's brother, Wayne McDaniel, left the room about 10 minutes later. Birkett waited another 10 minutes and then knocked at the closed door; he was let in the room by the defendant's father. The defendant was talking on the telephone; the defendant's father told Birkett that the defendant wanted to speak to an attorney before he told authorities what had happened. Birkett replied that if the defendant wanted an attorney he would have to make that request himself. The defendant testified at the suppression hearing that he told Birkett at that time that he wanted an attorney. The defendant also said that he repeated his request after he heard his father tell Birkett that the defendant wanted an attorney.

Around 11:30 Birkett, Mitchell, Kurzawa, and the defendant drove to the defendant's home so that the defendant could change clothes and pick up some items for his daughter. At the house, Birkett accompanied the defendant upstairs to the child's bedroom. Birkett testified that the defendant began to cry, stated that he "did it," and said that he would explain why after he talked

to an attorney. The defendant also said that the gun would be found that day. Later, while the defendant was changing clothes, he asked about the disarray in his closet. When told that investigators were still searching for the weapon, the defendant again said that the gun would be found that day.

Birkett, Kurzawa, Mitchell, and the defendant then left the defendant's house. After stopping to pick up food, they drove to the sheriff's office. Around 1:30 the defendant began making telephone calls to locate an attorney, and Birkett asked the defendant if he wanted to have the public defender appointed until private counsel could be retained. The defendant replied that he did. Birkett then called a judge, who, after talking to the defendant, appointed the county's public defender to represent the defendant.

The prosecution witnesses testified that the defendant was told repeatedly, throughout the questioning at the hospital and later, at his home, that he was free to leave. In addition, the prosecution witnesses stated that the defendant was allowed at the hospital to visit with his family members, to use the restroom facilities, and to eat and drink. The defendant's family members denied that they were allowed to visit with the defendant during that period. Birkett acknowledged that he repeatedly told the defendant that he did not believe that the defendant was telling the truth, that he mentioned that the defendant could be indicted even if he chose to leave, and that he told the defendant of a case in which a woman was convicted of voluntary manslaughter and received a relatively light sentence because of the special circumstances in her case.

Whether the defendant made a request for counsel is a factual question, and the parties agree that our role here is limited to determining whether the trial court's determination is against the manifest weight of the evi-

dence. (*People v. Reid* (1990), 136 Ill. 2d 27, 56.) In the present case, the defendant contends that the judge's resolution of this factual issue—that the defendant did not request counsel around 11 o'clock on the morning of May 18 at the hospital, as the defendant claimed, but did so instead at 1:30 that afternoon at the sheriff's office—is against the manifest weight of the evidence because Birkett's version of events, which the judge apparently accepted, was contradicted by other testimony presented at the suppression hearing.

Contrary to the defendant's argument, we cannot say on this record that the trial judge's resolution of this question was against the manifest weight of the evidence. At the suppression hearing, the trial judge was made aware of the infirmities claimed by the defendant in the State's evidence, including Birkett's conduct toward the defendant throughout the time of the questioning. Nonetheless, the judge chose to credit the prosecution witnesses and not to accept the defense version of events. We note, too, that the defendant in this case was well educated and had been previously employed as a police officer; the judge apparently did not believe the defendant's explanation that he continued to respond to questioning, notwithstanding his request for counsel, because he "forgot" himself. Deference is owed to the judge's decision because the judge is in a superior position to assess witness credibility, to determine the weight to be accorded to the testimony, and to consider what inferences to draw from the testimony. (*People v. Galvin* (1989), 127 Ill. 2d 153, 163.) We cannot say on this record that the judge's determination of this issue was contrary to the manifest weight of the evidence.

The defendant does not contend that he made an effective request for counsel later, when, in his daughter's room at home, he told Birkett that he would explain why he "did it" after he talked to a lawyer. When the

question was raised during trial, the judge concluded that the defendant's reference to an attorney was equivocal at best and did not constitute a request for the assistance of counsel. The judge's determination appears to be correct. (See *Davis v. United States* (1994), 512 U.S. 452, 461, 129 L. Ed. 2d 362, 373, 114 S. Ct. 2350, 2356 ("after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney").) Moreover, we note that the defendant's brief comments subsequent to the reference made in the child's room to an attorney were volunteered, and did not come in response to police-initiated interrogation. See *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 77 L. Ed. 2d 405, 103 S. Ct. 2830.

## II

The defendant raises two other contentions before this court. The defendant first argues that the trial judge erred in refusing to admit, at the suppression hearing, certain testimony by the defendant's brother-in-law and sister, Harris and Betty Brown. According to the defendant, the evidence in question was relevant and admissible, and would have contradicted Birkett's testimony that the defendant did not invoke his right to counsel.

Harris and Betty Brown testified in the defendant's behalf at the suppression hearing. The Browns were among the family members who visited with the defendant at the hospital around 11 o'clock on the morning of Mrs. McDaniel's death. At the suppression hearing, Harris Brown testified that he looked at the legal pad on which Birkett had been taking notes and asked the assistant State's Attorney why there had been "so much information, so many questions without an attorney being present." The trial judge sustained the State's objection to Birkett's answer. In an offer of proof, defense counsel said that Birkett replied that the defendant had just requested an attorney.

Betty Brown, in her testimony at the suppression hearing, stated that she asked Birkett if she could use the telephone to call an attorney for her brother. Defense counsel then asked Mrs. Brown what Birkett said to her after Birkett finished talking to her husband. The trial judge sustained the State's objection to that testimony. In an offer of proof, defense counsel stated that Birkett asked Betty Brown if she was able to reach an attorney for her brother.

The defendant renews here his contention that the trial judge erred in refusing to permit the Browns to testify to Birkett's comments to them. The defendant argues that the testimony of the witnesses regarding their conversations with Birkett was admissible, because the remarks by the assistant State's Attorney were admissions by an agent of a party opponent and therefore did not constitute hearsay. See *Werner v. Botti, Marinaccio & DeSalvo* (1990), 205 Ill. App. 3d 673; Fed. R. Evid. 801(d)(2)(D); M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 802.9 (6th ed. 1994).

We believe that Birkett's statements to Mr. and Mrs. Brown were hearsay and were properly excluded from evidence on that ground. Although in a civil case out-of-court statements of an agent may be introduced at trial as admissions of the agent's principal (*Werner*, 205 Ill. App. 3d 673) and, in a criminal case, a defendant's statements similarly may be introduced, the same analysis does not apply to out-of-court statements by agents of the State in a criminal prosecution. (29A Am. Jur. 2d *Evidence* § 819 (1994).) In rejecting a criminal defendant's contention that out-of-court statements by an agent of the government may be introduced by the defense at trial as an admission of a party opponent, one court has explained:

"Prior to adoption of the Federal Rules of Evidence, admissions by government employees in criminal cases were viewed as outside the admissions exception to the

hearsay rule. (*United States v. Powers* (7th Cir. 1972), 467 F.2d 1089, 1095.) Because the agents of the Government are supposedly disinterested in the outcome of a trial and are traditionally unable to bind the sovereign (*United States v. Santos* (2d Cir. 1967), 372 F.2d 177, 180), their statements seem less the product of the adversary process and hence less appropriately described as admissions of a party. Nothing in the Federal Rules of Evidence suggests an intention to alter the traditional rule and defendant has cited no contrary case indicating such a trend." *United States v. Kampiles* (7th Cir. 1979), 609 F.2d 1233, 1246.

As the preceding authority demonstrates, the trial judge in the present case properly refused to admit hearsay evidence of the prosecutor's out-of-court utterances. The defendant has provided us with no reason to depart from this rule.

### III

In his final allegation of error, the defendant contends that the public defenders who were appointed to represent him on the afternoon of the charged offense were ineffective. Specifically, the defendant claims that the attorneys improperly agreed to disclose to the State certain information—the location of the defendant's gun—without obtaining any valuable concessions in return. The public defenders were told that the State would consider a charge of voluntary manslaughter if this fact were revealed; the attorneys discussed the matter with the defendant, who then agreed to this disclosure. The defendant argues that the agreement was one-sided because the prosecution received crucial information while he gained nothing in return. The defendant observes that the offense of voluntary manslaughter no longer existed, having been replaced several years earlier by the offense of second degree murder and, further, that disclosure of the location of the gun could not have affected the prosecution's decision to charge him with first degree murder.

A defendant alleging ineffective assistance of counsel must show both a deficiency in counsel's performance and prejudice resulting from the asserted deficiency. (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.) Because a defendant must establish both propositions to succeed on an ineffective-assistance claim, a court may resolve the question without determining whether counsel was actually deficient if the court is able to conclude that no prejudice ensued from the conduct complained of. *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069; *People v. Flores* (1992), 153 Ill. 2d 264, 283-84.

In support of his argument, the defendant notes that he had previously denied to officers that he owned a gun, and he maintains that the revelation made through defense counsel enabled the prosecution at trial to contradict that claim and to describe him as a liar. The defendant also asserts that, in the absence of the statement made through counsel, he could have developed the alternative theory that the weapon had been left in the truck by his wife.

In the present case, it is clear that the defendant did not sustain any prejudice as a result of counsel's disclosure to law enforcement authorities. The information revealed by appointed counsel did not materially advance the prosecution's case. By the time the information was conveyed to law enforcement officers, the gun had already been recovered by investigators during their search of the defendant's vehicle. In addition, we note that, contrary to the defendant's argument before this court, the disclosure made through defense counsel was not the first time the defendant claimed to know where the gun was: he had previously told law enforcement authorities that the gun would be found later that day, implying that he knew where the weapon was located.

The evidence of the defendant's guilt in this case was overwhelming. The defendant told Assistant State's Attorney Birkett that he was responsible for the murder, and assured Birkett and other law enforcement agents that the case could be closed that day. Separately, the defendant's different accounts of his activities after leaving work that night contained significant gaps, were inconsistent in several material respects, and were contradicted by other evidence in the case. Moreover, investigating officers found no signs of a forced entry at the defendant's home and no evidence that an unauthorized person had been on the premises that night. As a final matter, the defendant initially denied experiencing marital problems or having a girlfriend; a female coworker at the airport, however, testified that the defendant had vowed to marry her after he sold his house and divorced his wife—a plan that he said was nearly accomplished.

In view of the strong evidence of the defendant's guilt, and the relative unimportance of the information revealed by defense counsel, which was essentially cumulative to other information possessed by the prosecution, we do not believe that the defendant has sustained his burden of establishing prejudice as a result of the alleged deficiency in the public defenders' representation. Accordingly, we must reject the defendant's claim of ineffective assistance of counsel.

For the reasons stated, the judgment of the appellate court, which affirmed the judgment of the circuit court of Du Page County, is affirmed.

*Judgment affirmed.*