678 N.E.2d 743 (1997)
287 Ill. App.3d 655
222 Ill.Dec. 871
Ron JASNIOWSKI and A. Avana Electric Motors, Inc., Plaintiffs-Appellants,
v.
Benson RUSHING and City of Chicago Commission on Human Relations, Defendants-Appellees.
No. 1-95-0365.
Appellate Court of Illinois, First District, Sixth Division.
March 31, 1997.
Rehearing Denied April 30, 1997.
*744 Jordan Lorence, Fairfax, VA, Thomas Appel, Lansing, for Plaintiffs-Appellants.
Shari J. Engelken, Michael A. Parks of Kirkland & Ellis, Chicago, Karen Berman, Clyde E. Murphy, of Chicago Lawyers' Committee for Civil Rights Under Law, Inc., Chicago, for Defendant-Appellee Benson Rushing.
*745 Susan S. Sher, Corporation Counsel, Lawrence Rosenthal, Deputy Corporation Counsel, Chicago, for Defendant-Appellee City of Chicago.
Justice THEIS delivered the opinion of the court:
The plaintiffs, Ron Jasniowski (Jasniowski) and A. Avana Electric Motors, Inc. (Avana), appeal from the circuit court's final order on their petition for common law writ of certiorari. In the circuit court, the plaintiffs sought review of an order of the City of Chicago Commission on Human Relations (the Commission) granting relief in favor of the respondent, Benson Rushing (Rushing), on the grounds that they had discriminated against him because of his marital status in violation of the Fair Housing Regulations of the City of Chicago. Chicago Municipal Code § 5-8-010 et seq. (1990). Specifically, plaintiffs would not rent an apartment to Rushing because he and a woman named Mary Tews (Tews) planned to live in the apartment together, but were not married. The circuit court affirmed the decision of the Commission. The plaintiffs now seek appellate review pursuant to Supreme Court Rule 303(a)(1). 155 Ill.2d R. 303(a)(1). We affirm the decision of the circuit court.

BACKGROUND
Avana is a secular, for-profit, subchapter S corporation engaged in the business of repairing and selling electric motors. Jasniowski is Avana's president, sole officer, and sole shareholder. Jasniowski's mother, Martha Jasniowski, owns a building comprised of both commercial space and a residential apartment. Martha Jasniowski leases the entire building to Avana. The lease between Avana and Martha Jasniowski allows Avana to occupy the building and authorizes Avana to sublease the apartment. The lease does not contain any religious restrictions regarding sublessees.
In June 1992, Avana publicly advertised the apartment for rent in Chicago, Illinois. Rushing and Tews submitted an application to lease the apartment, indicating they were married. Jasniowski initially decided to rent them the apartment. Rushing and Tews, however, were unable to produce the requested proof of marriage and they decided to pursue other housing. Although Jasniowski did not refuse to rent to Rushing and Tews directly, he admits that he would not have leased the apartment to them because they were not married. He maintains that renting to an unmarried couple would conflict with his religious beliefs against sexual relations outside of marriage. He further contends that his religious beliefs render him a "steward" over his property and, therefore, he must manage his property according to his understanding of the Bible.
On July 23, 1992, Rushing filed a complaint with the City of Chicago Commission on Human Relations, alleging that Jasniowski had discriminated against him because of his marital status. At the pre-hearing conference, the hearing officer properly allowed Rushing's oral motion to add Avana as a respondent. After a full hearing on the merits, the Commission found that Jasniowski held sincere religious beliefs and that he refused to rent the apartment to Rushing and Tews because they were not married but planned to live there together. The Commission determined that Jasniowski's refusal to rent to Rushing constituted discrimination on the basis of marital status in violation of the Fair Housing Regulations of the City of Chicago. Chicago Municipal Code § 5-8-010 et seq. (1990). The Commission rejected Jasniowski's claim that the ordinance burdens his free exercise of religion. The Commission awarded Rushing damages and attorney fees totaling approximately $14,000. The circuit court affirmed the Commission's decision.

DISCUSSION
The first issue on appeal is whether the Chicago Fair Housing Regulations, which prohibit housing discrimination on the basis of marital status, prevent a person from refusing to rent an apartment to an unmarried, cohabiting couple. Five state supreme courts have addressed this question in one form or another. See Swanner v. Anchorage Equal Rights Commission, 874 P.2d 274 (Alaska 1994), cert. denied, 513 U.S. 979, 115 S.Ct. 460, 130 L.Ed.2d 368 (1994); Smith v. *746 Fair Employment & Housing Commission, 12 Cal.4th 1143, 51 Cal.Rptr.2d 700, 913 P.2d 909 (1996); Attorney General v. Desilets, 418 Mass. 316, 636 N.E.2d 233 (1994); State by Cooper v. French, 460 N.W.2d 2 (Minn.1990); County of Dane v. Norman, 174 Wis.2d 683, 497 N.W.2d 714 (1993).
A threshold issue is how to define discrimination against an unmarried, cohabiting couple. We agree that the discrimination at issue is based on marital status, not the conduct of the prospective tenants. Accord Swanner v. Anchorage Equal Rights Commission, 874 P.2d 274, 278 n. 4 (Alaska 1994); Attorney General v. Desilets, 418 Mass. 316, 636 N.E.2d 233, 235 (1994). Assuming both married and unmarried couples engage in the same conduct, the only distinction is that one couple has the status of "married" whereas the other couple is "unmarried." Jasniowski's religious objection is that allowing a man and woman to cohabit as an unmarried couple promotes fornication. We accept the Commission's factual determinations that Jasniowski's religious beliefs were sincerely held and that Rushing and Tews constituted an unmarried, cohabiting couple.
Thus, the question is whether the Chicago Fair Housing Regulations (Chicago ordinance or ordinance) prevent Jasniowski from refusing to rent the apartment to an unmarried, cohabiting couple. Section 5-8-030C of the ordinance provides that "[I]t shall be an unfair housing practice and unlawful for any owner, lessee, sublessee, * * * [t]o refuse to sell, lease or rent, any real estate for residential purposes within the city of Chicago because of * * * marital status * * * of the proposed buyer or renter." Chicago Municipal Code § 5-8-030C (1990). Section 5-8-040 explains that "marital status" has the same meaning as described in chapter 2-160 of the Chicago human rights ordinance, which defines "[m]arital status" as "the legal status of being single, married, divorced, separated or widowed." Chicago Municipal Code § 2-160-020(f) (1990).
The Commission determined that "marital status" in the ordinance extends housing discrimination protection to unmarried cohabiting couples and that Jasniowski's refusal to rent to Rushing constituted a violation of the ordinance. Because the Commission is the agency charged with enforcing the ordinance, its determination as to the intent and scope of the ordinance is entitled to substantial deference. Boaden v. Department of Law Enforcement, 171 Ill.2d 230, 239, 215 Ill.Dec. 664, 668, 664 N.E.2d 61, 65 (1996).
When an ordinance is clear, a court is bound by its plain language and meaning. Solich v. George & Anna Portes Cancer Prevention Center, 158 Ill.2d 76, 81, 196 Ill.Dec. 655, 657, 630 N.E.2d 820, 822 (1994). Jasniowski argues that "marital status" protects individuals who are married, single, separated, divorced, or widowed, but does not extend protection to unmarried couples. Conversely, Rushing and the City of Chicago argue that renting to a man and a woman who are married, while refusing to rent to a man and a woman who are unmarried, by definition, constitutes "marital status" discrimination. Because the meaning of "marital status" is unclear, we look to other indicia of legislative intent to determine the statutory meaning. From this review, we have no doubt that the Chicago City Council intended to protect unmarried cohabiting couples from housing discrimination within the City of Chicago.
Remedial legislation generally is afforded a liberal interpretation. Tandy Corp. v. Human Rights Commission, 264 Ill. App.3d 828, 832, 202 Ill.Dec. 186, 189, 637 N.E.2d 725, 728 (1994). Chicago passed its first fair housing ordinance in 1963, to prohibit housing discrimination based on race, color, religion, national origin, or ancestry. Chicago Municipal Code ch. 198.7-B (eff. September 11, 1963). Illinois passed the Illinois Human Rights Act to protect against unlawful discrimination in employment, real property transactions, access to financial credit, and public accommodations. Pub. Act 81-1216, eff. July 1, 1980.
Over the years, both the Chicago ordinance and the Illinois Human Rights Act have been broadened to protect a wide array of groups subject to potential housing discrimination. The Chicago ordinance assures "full and equal" housing opportunity to all *747 residents of Chicago and protects the following categories from discrimination: "race, color, sex, age, religion, disability, national origin, ancestry, sexual orientation, marital status, parental status, military discharge status or source of income." (Emphasis added.) Chicago Municipal Code § 5-8-010 (1990).
The breadth of categories included in the ordinance indicates that Chicago intended to provide universal protection from housing discrimination to all its residents, in whatever combination. Inclusion of sexual orientation as a protected category is particularly enlightening. The inclusion of sexual orientation implies that the City Council understood unmarried cohabitants to be protected. Chicago Municipal Code ch. 198.7B (amended December 21, 1988, to include, inter alia, sexual orientation); County of Dane v. Norman, 174 Wis.2d 683, 497 N.W.2d 714, 722 (1993) (Heffernan, C.J., dissenting). Thus, we agree with the Commission that under section 5-8-030 of the Chicago ordinance, the City of Chicago extended housing discrimination protection to unmarried, cohabiting couples.
The next consideration is whether Chicago had the authority to enact such measures. We have no difficulty finding that Chicago had the power to pass the ordinance under both its constitutional home-rule authority and its statutory authority as granted by the Illinois legislature. Under the Illinois Constitution, the City of Chicago is a home-rule unit giving it the authority to "exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt." Ill. Const.1970, art. VII, § 6(a). In addition, the Illinois Human Rights Act allows municipalities to pass antidiscrimination measures broader than Illinois law. Ill.Rev.Stat.1991, ch. 68, par. 7-108(A). Thus, the City of Chicago had the power to adopt an expansive housing ordinance.
The more complex question is whether Chicago's antidiscrimination housing provision conflicts within any larger Illinois precedent or public policy. Jasniowski argues that this court is bound by Mister v. A.R.K Partnership, 197 Ill.App.3d 105, 143 Ill.Dec. 166, 553 N.E.2d 1152 (1990), which held that the prohibition against marital status discrimination in the Illinois Human Rights Act did not apply to a landlord's refusal to lease an apartment to unmarried individuals of the opposite sex. After finding the meaning of "marital status" discrimination in the Illinois Human Rights Act ambiguous, the court determined that extending protection to unmarried couples would conflict with the Illinois antifornication statute and the Illinois Marriage and Dissolution of Marriage Act. Mister, 197 Ill.App.3d at 118, 143 Ill.Dec. at 174, 553 N.E.2d at 1160. Jasniowski argues that because the definition of "marital status" in the Chicago ordinance contains the same language as in the Illinois Human Rights Act, the Mister decision controls.
First, we find that Mister is not controlling. Mister relied on the Illinois antifornication statute to construe public policy. In 1990, however, the Illinois legislature decriminalized cohabitation. Pub.Act 86-490, eff. January 1, 1990 (amending Ill.Rev.Stat.1989, ch. 38, par. 11-8). Thus, Mister is distinguishable based on its reliance on the criminal nature of cohabitation. We also reject Jasniowski's argument that the Chicago ordinance conflicts with Chicago's fornication ordinance, which is aimed at prohibiting houses of ill-fame or assignation. See Chicago Municipal Code § 8-8-010 (1990).
More importantly, the Chicago ordinance does not conflict with Illinois public policy. By express authority from the Illinois legislature, the Chicago ordinance is legitimately broader than the Illinois Human Rights Act, which does not include sexual orientation, parental status, or source of income as protected categories. Ill.Rev.Stat. 1991, ch. 68, pars. 1-103(Q), 7-108. We also note the Illinois Domestic Violence Act protects persons abused by a family or household member. 750 ILCS 60/201(a)(i) (West 1992).
Additionally, the Chicago ordinance does not conflict with prior Illinois cases disapproving of cohabitation for the elevated purposes of granting marital property rights *748 and child custody. Our supreme court has declined to apply marital property laws to cohabitants (Hewitt v. Hewitt, 77 Ill.2d 49, 31 Ill.Dec. 827, 394 N.E.2d 1204 (1979)), and has modified child custody based on a parent's open and continuing cohabitation. Jarrett v. Jarrett, 78 Ill.2d 337, 345, 36 Ill.Dec. 1, 3-4, 400 N.E.2d 421, 423-24 (1979). These cases, however, do not defeat the basic aim of the Chicago ordinance. The State may legitimately promote marriage when the issue concerns the existence of legal rights specifically emanating from the institution of marriage. In contrast, the aim of the Chicago ordinance is fairnessto promote "full and equal" housing opportunity to all Chicago residents. Accordingly, the scope of the Chicago housing ordinance does not interfere with the scope of Illinois marital rights.
Likewise, the Illinois Supreme Court's recent decision narrowly interpreting "marital status" in the Illinois Human Rights Act does not compel a different result. Boaden v. Department of Law Enforcement, 171 Ill.2d 230, 215 Ill.Dec. 664, 664 N.E.2d 61 (1996), concerned whether the Illinois Human Rights Act prohibition against marital status discrimination prohibits no-spouse policies in the workplace. The supreme court upheld no-spouse policies construing "marital status" as defined in the Illinois Human Rights Act to refer only to the status of an individual. Boaden, 171 Ill.2d at 238, 215 Ill.Dec. at 668, 664 N.E.2d at 65.
We do not find any inconsistency between our opinion today and the employment-based holding in Boaden. The Chicago ordinance is a remedial provision, designed to assure housing access to all residents of Chicago. The Chicago ordinance is written more broadly than the Illinois Human Rights Act. Moreover, the Illinois Constitution also supports the importance of basic housing availability. Ill. Const.1970, art. I, §§ 17-19. In short, the City of Chicago had the authority and intended to adopt measures to protect all residents of Chicago from housing discrimination. This legislation does not conflict with Illinois public policy and is not defeated by any variant interpretation of the same terms in the Illinois Human Rights Act.
Given that the Chicago ordinance prohibits housing discrimination against unmarried, cohabiting couples, the next question is whether Jasniowski may challenge its enforcement as a burden upon his free exercise of religion. In 1990, the United States Supreme Court retooled the test for determining whether a particular law unconstitutionally burdens a person's free exercise of religion. Employment Division, Dept. of Human Resources of Oregon v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). Under the Smith rationale, "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531, 113 S.Ct. 2217, 2226, 124 L.Ed.2d 472, 489 (1993).
We need not reach the constitutional issue, however, because Congress enacted the Religious Freedom Restoration Act of 1993 to restore the pre-Smith constitutional standard for religious freedom. 42 U.S.C. § 2000bb (1993) (Restoration Act). The Restoration Act applies to all Federal and State law (including subdivisions of a State) "whether adopted before or after November 16, 1993." 42 U.S.C. §§ 2000bb-2(1), 2000bb-3(a) (1993). Because a congressional act is presumed constitutional until otherwise determined, we apply the analysis set forth in the Act. Zobrest v. Catalina Foothills School Dist., 509 U.S. 1, 7, 113 S.Ct. 2462, 2465-66, 125 L.Ed.2d 1, 9 (1993). We note that the United States Supreme Court has granted certiorari to address the validity of the Restoration Act. Flores v. City of Boerne, 73 F.3d 1352 (5th Cir.1996), cert. granted, ___ U.S. ___, 117 S.Ct. 293, 136 L.Ed.2d 212 (1996). Until the Court resolves that issue, if the Restoration Act requires reversal of the Commission's decision, the result is based on the Supremacy Clause of the United States Constitution. U.S. Const., art. VI, cl. 2.
The Religious Freedom Restoration Act codifies the pre-Smith Supreme Court compelling interest test: "Government shall not substantially burden a person's exercise of *749 religion even if the burden results from a rule of general applicability," unless the government "demonstrates that application of the burden to the person(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a), (b) (1993). Section 1(c) provides for judicial relief and explains that standing to assert a claim or defense under the Restoration Act is governed by the general rules of standing under article III of the United States Constitution. 42 U.S.C. § 2000bb-1(c) (1993).
We first address Jasniowski's standing to assert a constitutional free exercise of religion defense. Martha Jasniowski owns the property. Avana, the corporation, leases the building and has authority to sublet the apartment. Jasniowski is Avana's president, sole officer, and sole shareholder. Avana and Jasniowski are interchangeable. The nexus between the sole proprietor and his business is sufficiently compelling such that Avana can raise a free exercise challenge asserting the free exercise rights of its sole corporate officer and shareholder, Jasniowski. See E.E.O.C. v. Townley Engineering & Manufacturing Co., 859 F.2d 610, 611-12 (9th Cir.1988). We concur in the logic of the Commission when it stated:
"To deprive Jasniowski of his ability to raise a religious objection to the Ordinance because he chose to incorporate his sole proprietorship is to make the assertion of a constitutional right turn upon a business choice which was undoubtedly made in ignorance of the fact that a First Amendment right was thereby being waived." Rushing v. Jasniowski, Chicago Commission on Human Relations Report No. 92-H-127 (May 18, 1994).
In this limited context, and based on the facts before us, we find that Avana may assert the religious beliefs of its alter ego, Jasniowski.
Moreover, we do not draw a distinction between a property owner versus a sublessor for purposes of the free-exercise analysis in this particular case. As lessee, Avana retains exclusive possession of the building. Under the lease, Avana is allowed to sublease the residential apartment. If the owner wanted to lease the property and assert a free-exercise defense, she would be entitled to do so. Avana is not raising any rights greater than those of the original owner. Thus, Jasniowski's free-exercise challenge is not defeated by the corporate entity or its legal relation as a sublessor in this circumstance.
We now consider whether the Chicago ordinance places a substantial burden on Jasniowski's free exercise of religion. The Restoration Act does not define substantial burden. In fact, whether a "substantial burden" may be quantified is at the heart of the current constitutional religious debate. Nevertheless, based on Wisconsin v. Yoder, Sherbert v. Verner, and their progeny, the hallmark of a substantial burden on one's free exercise of religion is the coercive choice of either abandoning one's religious convictions or complying with the governmental regulation. Wisconsin v. Yoder, 406 U.S. 205, 217-18, 92 S.Ct. 1526, 1534, 32 L.Ed.2d 15, 26 (1972); Sherbert v. Verner, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965, 970 (1963); see also Thomas v. Review Bd. of Indiana Employment Security Division, 450 U.S. 707, 717-18, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624, 633-34 (1981). Under this standard, enforcement of the Chicago ordinance against Jasniowski imposes a substantial burden on the free exercise of his religion. Through Avana, Jasniowski sublets the residential apartment. Jasniowski believes renting the apartment to an unmarried, cohabiting couple violates his religious beliefs. The Chicago ordinance requires him to do so, thereby subjecting him to penalties and costs for noncompliance. Jasniowski is thus forced to choose between his religious convictions and compliance with the Chicago housing ordinance.
We emphasize that the substantial burden is defined by Jasniowski's "either-or" choice to comply with the ordinance or adhere to his religious convictions, not merely by its economic impact. Thus, the burden is not measured in terms of the costs imposed for violating the ordinance. Nor is the burden defensible by the suggestion that *750 Jasniowski simply may surrender his right to lease, rent, and derive income from the property in order not to violate his religious beliefs. We likewise reject the argument that Jasniowski's consistent religious ethic is subject to blanket submission upon his entry into the marketplace. Attempting to earn a living does not require an individual to sacrifice all religious precepts. United States v. Lee, 455 U.S. 252, 261, 102 S.Ct. 1051, 1057, 71 L.Ed.2d 127, 134-35 (1982) (holding that the government had a compelling interest in maintaining the tax system, not that the employer had abdicated his religious beliefs upon entry into the marketplace).
Equally unavailing is any notion that the burden is de minimis. As noted by Justice Douglas in his concurrence in Sherbert: "The result turns not on the degree of injury, which may indeed be nonexistent by ordinary standards. The harm is the interference with the individual's scruples or conscience an important area of privacy which the First Amendment fences off from government." Sherbert v. Verner, 374 U.S. at 412, 83 S.Ct. at 1798, 10 L.Ed.2d at 975 (Douglas, J., concurring). Free exercise of Jasniowski's religious beliefs conflicts with Chicago's mandate that he rent the apartment indiscriminately. We find that the Chicago housing ordinance's prohibition against marital status discrimination substantially burdens the free exercise of Jasniowski's sincere religious beliefs.
Thus, it becomes incumbent upon the City of Chicago to demonstrate that enforcing the ordinance against Jasniowski furthers a compelling interest and is the least restrictive means of furthering that compelling interest. 42 U.S.C. § 2000bb-1(b)(2) (1993). The Commission did not reach the compelling interest issue. The circuit court, however, found that even assuming Jasniowski was substantially burdened, the government had a compelling interest.
The City of Chicago has an interest in prohibiting housing discrimination generally. For free exercise analysis, however, the courts consistently explain that the state's interest must be narrowly defined. Thomas, 450 U.S. at 719, 101 S.Ct. at 1432, 67 L.Ed.2d at 634; Yoder, 406 U.S. at 228-29, 92 S.Ct. at 1540, 32 L.Ed.2d at 32. Thus, the narrower question is whether specifically prohibiting housing discrimination against unmarried cohabiting couples is a compelling governmental interest. See Attorney General v. Desilets, 418 Mass. 316, 636 N.E.2d 233, 238 (1994).
Again, the Restoration Act does not define a compelling governmental interest. Since Yoder and Sherbert, the Court has found a compelling interest in maintaining the tax system (Hernandez v. Commissioner of Internal Revenue, 490 U.S. 680, 699-70, 109 S.Ct. 2136, 2148-49, 104 L.Ed.2d 766, 787 (1989)); maintaining the Social Security system (United States v. Lee, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982)); upholding military conscription laws (Gillette v. United States, 401 U.S. 437, 461-62, 91 S.Ct. 828, 842-43, 848, 28 L.Ed.2d 168, 187 (1971)); and providing a uniform day of rest (Braunfeld v. Brown, 366 U.S. 599, 608-09, 81 S.Ct. 1144, 1148-49, 6 L.Ed.2d 563, 569-70 (1961)). See Employment Division, Dept. of Human Resources of Oregon v. Smith, 494 U.S. 872, 896, 110 S.Ct. 1595, 1609, 108 L.Ed.2d 876, 897 (1990) (O'Connor, J. concurring). In contrast, the Court has declined to find a compelling interest in only limited contexts: the school attendance of Amish children to age 16 (Yoder, 406 U.S. at 228-29, 92 S.Ct. at 1540, 32 L.Ed.2d at 32); and prevention of fraudulent unemployment benefit claims (see Hobbie v. Unemployment Appeals Commission of Florida, 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987); Thomas, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); Sherbert, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)).
Under Illinois law, determining whether Chicago has a compelling interest is analogous to the balancing required in church zoning cases. Enacted pursuant to the police power of the State, zoning laws effect a legitimate restraint on a person's use of his property if they substantially promote public health, safety, morals, or the general welfare. Columbus Park Congregation of Jehovah's Witnesses, Inc. v. Board of Appeals of City of Chicago, 25 Ill.2d 65, 70-71, 182 N.E.2d 722, 725 (1962). And while the location of churches implicates freedom of *751 religion and free exercise, government can regulate their location if it demonstrates a substantial interest in a particular case. Columbus Park, 25 Ill.2d at 71, 182 N.E.2d at 725. Implicit in the government's police power to promote the general health, safety, and welfare of the community is a recognition of the rights of all members of society.
Likewise, in this case, the City of Chicago's concern in prohibiting housing discrimination against unmarried, cohabiting couples promotes the universal interest of Chicago residents in available housing. The policy statement of the Chicago ordinance secures "full and equal opportunity to all residents of the city to obtain fair and adequate housing for themselves and their families in the city of Chicago without discrimination." Discrimination is then broadly defined to protect all of the following categories: "race, color, sex, age, religion, disability, national origin, ancestry, sexual orientation, marital status, parental status, military discharge status or source of income." Chicago Municipal Code § 5-8-010 (1990).
Moreover, what distinguishes this situation from other free exercise cases is the direct impact of Jasniowski's religious objection on the interests of third parties. See generally Michael W. McConnell, The Origins and Historical Understanding of Free Exercise of Religion, 103 Harv.L.Rev. 1409, 1464 (1990); Michael W. McConnell, Free Exercise Revisionism and the Smith Decision, 57 U.Chi.L.Rev. 1109, 1145-46 (1990). Specifically at issue is the effect of Jasniowski's free exercise on Benson Rushing's "full and equal" opportunity for housing in the City of Chicago.
Adding the interests of the prospective tenant Rushing changes the equation. The balance thus becomes Jasniowski's free exercise as weighed against the City of Chicago's general interest in preventing housing discrimination and Rushing's individual interest in access to housing. While the weight of the interests is admittedly close, the impact of Jasniowski's religious objection on third parties tips the balance in favor of the government. Thus, we find that the City of Chicago has a compelling interest in prohibiting housing discrimination against unmarried, cohabiting couples. Chicago's interest in prohibiting this specific housing discrimination is integral to its overall interest in prohibiting all housing discrimination. Accordingly, universal enforcement, including enforcement against Jasniowski, is the least restrictive means available. 42 U.S.C. § 2000bb(b)(2) (1993). Accord Lee, 455 U.S. at 260, 102 S.Ct. at 1056-57, 71 L.Ed.2d at 134.
Because our decision is based on application of the Religious Freedom Restoration Act, we decline to address whether the Chicago ordinance violates the Illinois Constitution. People v. McDaniel, 164 Ill.2d 173, 180, 207 Ill.Dec. 304, 307, 647 N.E.2d 266, 269 (1995). The Illinois Supreme Court has held that like provisions in the Illinois and federal constitutions are to be similarly construed unless the drafters indicated a contrary intent. People v. Tisler, 103 Ill.2d 226, 243, 82 Ill.Dec. 613, 622, 469 N.E.2d 147, 156 (1984). Because the Illinois Supreme Court, however, has not considered the scope of the Illinois Constitution in light of the United States Supreme Court's decision in Smith, we decline to consider the constitutionality of the Chicago ordinance under the Illinois Constitution.
In conclusion, the City of Chicago intended to enact a broad housing discrimination ordinance that would include in its protection unmarried, cohabiting couples. Under the Religious Freedom Restoration Act, Jasniowski has demonstrated that enforcement of the Chicago ordinance against him imposes a substantial burden on his free exercise of religion. We conclude, however, that the City's compelling interest in eliminating all forms of housing discrimination, including that against unmarried, cohabiting couples, defeats Jasniowski's claim to a free exercise exemption. Thus, the Commission properly enforced the ordinance against Jasniowski and was authorized to award damages, emotional distress, and attorney fees to Rushing. Atkins v. Chicago Commission on Human Relations ex rel. Lawrence, 281 Ill.App.3d 1066, 1076-77, 217 Ill.Dec. 575, 581-82, 667 N.E.2d 664, 670-71 (1996). Accordingly, we affirm the decisions of the circuit court and *752 the City of Chicago Commission on Human Relations.
Affirmed.
CAHILL, J., concurs.
O'BRIEN, J., dissents.
Justice Sheila M. O'BRIEN, dissenting:
There are three specific areas in which I part company with the majority: (1) whether an actual controversy exists between the parties, (2) whether unmarried, cohabiting heterosexual couples are included in the definition of "marital status" in the ordinance, and (3) whether the City has a compelling governmental interest which overrides the burden on Jasniowski's exercise of his religion.
First, there is no actual controversy between the parties as this is a premature claim. An actual controversy exists when the underlying facts and issues of the case are not moot or premature, so as to require the court to pass judgment on mere abstract propositions of law, render an advisory opinion, or give legal advice as to future events. Underground Contractors Ass'n v. City of Chicago, 66 Ill.2d 371, 375, 5 Ill.Dec. 827, 829, 362 N.E.2d 298, 300 (1977). An action is premature when a party's rights are dependent upon the outcome of future events. See generally Howlett v. Scott, 69 Ill.2d 135, 13 Ill.Dec. 9, 370 N.E.2d 1036 (1977).
Here, several salient facts overlooked by the majority establish that Rushing's claim is premature. The application for a lease, completed and signed by Rushing, lists Mary Tews as Mary Rushing, and one of the identification cards for Benson Rushing lists him as Anthony Rushing. At the hearing before the Board, both Rushing and Jasniowski testified that after Jasniowski asked for and received identification cards to confirm their identities, Jasniowski questioned the difference between Tews' name on the lease and her name on the identification card.
Jasniowski further testified that he was concerned about their identities, that Rushing said they were married, but was only able to give an approximate marriage date as he was purportedly drunk when he married. Jasniowski then testified that he asked Rushing if Rushing and Tews had a marriage certificate, that Rushing responded yes and stated that he would call Jasniowski.
Rushing testified that he telephoned Jasniowski the next day. When asked if he could relay the parties' conversation, Rushing stated:
A: I said: I don't have a marriage certificate, I can't produce one, we're not married. Will you still rent me the apartment.
Q: What did he say or what did you say to him?
A: I said: I will be by tomorrow to pick up the documents that you made copies of.
Q: Was anything else stated?
A: At that point, I can't recall.
By Rushing's own testimony, Rushing withdrew from negotiations for the apartment and Jasniowski did not deny Rushing the apartment after learning Rushing and Tews were not married. Rushing's withdrawal of his application was corroborated by Jasniowski who testified that "* * * Rushing called up and stated that he cannot find a marriage certificate and that he was going to be coming back to pick up his paperwork * * *."
Moreover, throughout the hearing, Jasniowski was repeatedly asked whether he "would have" denied the apartment to Rushing and Tews and under what circumstances. That language indicates that the completion of a future event was necessary to determine the rights of the parties; a fact which renders Rushing's claim of discrimination premature. Accordingly, there is no actual controversy between the parties.
Second, the ordinance term "marital status" does not include unmarried, cohabiting heterosexual couples. The term "marital status" is ambiguous because it is susceptible to more than one meaning. In the interpretation of ambiguous statutes, a court of review is required to ascertain and effectuate the legislative intent. Mister v. A.R.K. Partnership, 197 Ill.App.3d 105, 113, 143 Ill.Dec. 166, 170, 553 N.E.2d 1152, 1156 (1990). Because there is no record of the City Council debate or comment concerning "marital status," other indications of legislative intent are necessary.
*753 In 1973, the ordinance at issue was amended to add, inter alia, "marital status." Council Journal for Chicago City Council, June 6, 1973, at 5704. At that time, the Criminal Code of 1961, as amended, prohibited fornication and cohabitation. The relevant statute provided:
"(a) Any person who cohabits or has sexual intercourse with another not his spouse commits fornication if the behavior is open and notorious.
(b) Penalty. A person convicted of fornication shall be fined not to exceed $200 or imprisoned in a penal institution other than the penitentiary not to exceed six months, or both." Ill.Rev.Stat.1971, ch. 38, par. 11-8.
Surely the City Council could not have intended to protect behavior or people engaging in behavior which was criminal in nature, specifically proscribed by the General Assembly and thus, in contravention of the public policy of the State.
In contrast, the statute contained in the Criminal Code of 1961, as amended, prohibiting sodomy (Ill.Rev.Stat.1961, ch. 10, par. 141) was repealed in 1962 (Ill.Rev.Stat.1961, ch. 38, par. 35-1 (eff. Jan. 1, 1962)), and the statute prohibiting deviate sexual conduct (Ill.Rev.Stat.1961, ch. 38, par. 11-2) was repealed in 1984 (Pub.Act 832067, § 28, eff. July 1, 1984), well before the City Council added "sexual orientation" to the ordinance in 1988. Surely, the same legislative body which repealed the sodomy and deviate sexual conduct statutes could have repealed the fornication statute if it so desired. The fact that it did not do so is indicative of the General Assembly's intent. Accordingly, I disagree with the majority's assertion that the "breadth of categories included in the ordinance" and in particular the 1988 addition of "sexual orientation" thereto implies the City Council intended to protect unmarried, cohabiting heterosexual couples. Rather, because of the public policy proscription against cohabitation and fornication in force at the time of the addition of "marital status" to the ordinance, the City Council did not intend to include nor does the ordinance include unmarried cohabiting heterosexual couples under the term "marital status."
Nor does the 1990 amendment to the fornication statute, removing cohabitation, change the public policy of the State so as to render the ordinance in compliance with public policy. The House of Representatives debate addressing the 1990 amendment indicates the "cohabits or" language was removed for the benefit of senior citizens and college students who might need to share housing free from the fear of prosecution under the statute. 86th Ill. Gen. Assem., House Proceedings, May 9, 1989, at 43-44 (statements of Representative Klemm). Additionally, a review of other statutes reveals that the public policy of Illinois still regards fornication as proscribed behavior. The Slander and Libel Act provides:
"If any person shall falsely use, utter or publish words, which * * * amount to charge any person with having been guilty of fornication or adultery, such words so spoken shall be deemed actionable, and he shall be deemed guilty of slander." 740 ILCS 145/1 (West 1994).
The Adoption Act, in specifying grounds for finding a person unfit to adopt, provides:
"`Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption, the grounds of such unfitness being any one or more of the following:
* * * * * *
(j) open and notorious adultery or fornication." 750 ILCS 50/1 C (j) (West 1994).
In sum, fornication remains punishable by up to six months in the county jail (720 ILCS 5/11-8 (West 1994)), and is otherwise disfavored. And although Rushing and the Commission assert that the fornication statute is little prosecuted and should be discounted by this court, the concept of "implied repeal" is unprecedented. It is not the role of the judiciary to question the societal relevance of particular statutes, comment upon their propriety, or declare them of little use. Our role here is to ascertain the intent of the City Council and whether it is in concert with the public policy of the state as rightfully determined by our legislature. Because the statute proscribing fornication reflects Illinois' *754 continuing public policy against fornication, it follows that unmarried, cohabiting heterosexual couples are not included in the protection afforded by the ordinance.
Finally, and most troubling, are the findings of the majority that the City has a compelling governmental interest which overrides the burdenfound to be substantial by the majorityon Jasniowski's exercise of religion and is using the least restrictive means of enforcement.
First, a review of the standard.
The majority concedes that the proper analysis is established in the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq. (1993). The Restoration Act provides, in part:
§ 2000bb-1. Free exercise of religion protected.
(a) In general. Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).
(b) Exception. Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person
(1) is in furtherance of a compelling governmental interest; and
(2) is the least restrictive means of furthering that compelling governmental interest. (Emphasis added.)
42 U.S.C. § 2000bb-1(a), (b) (1993).
§ 2000bb-3. Applicability
(a) In general. This Act applies to all Federal and State law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after the enactment of this Act." 42 U.S.C. § 2000bb-3 (1993).
Accordingly, the City must establish the existence of a compelling governmental interest in prohibiting housing discrimination against unmarried, cohabiting heterosexual couples, and that it has used the least restrictive means to achieve that end. This test requires more than the establishment of a general interest in eradicating housing discrimination in order to justify the burden placed upon Jasniowski's free exercise of his religion. See generally Wisconsin v. Yoder, 406 U.S. 205, 224-229, 92 S.Ct. 1526, 1537-1540, 32 L.Ed.2d 15 (1972); Thomas v. Review Board of Indiana Employment Sec. Div., 450 U.S. 707, 719, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981); and Sherbert v. Verner, 374 U.S. 398, 407, 83 S.Ct. 1790, 1795-96, 10 L.Ed.2d 965 (1963).
Second, a review of the record.
On July 15, 1993, testimony in this case was taken. It contained the testimony of (1) Benson Rushing as to his conversations and dealings with Jasniowski and Marissa Legittino, an employee of Avana; (2) Mary Tews as to her conversations and dealings with Jasniowski and Legittino; (3) Ron Jasniowski as to his conversations with Rushing and Tews, his religious beliefs, and Avana; (4) Carmen Felix, one of Jasniowski's tenants, as to her dealings with Jasniowski; (5) Legittino, as to her dealings with Rushing, Tews, and Jasniowski; (6) Rick Donald, Jasniowski's pastor, as to Jasniowski's religious beliefs.
Exhibits in evidence were the following:
Rushing's exhibits
A) application for lease
B) proposed lease
Jasniowski's exhibits
1) articles of incorporation for Avana Electric Motors, Inc.
2) goals of the corporation
3) acknowledgment of state of articles of incorporation
4) 1992 annual report for Avana Electric Motors, Inc.
5) 1993 annual report for Avana Electric Motors, Inc.
6) stock certificate for stock in Avana
7) letter from IRS regarding Avana as a subchapter s corporation
8) actions of sole shareholder of Avana
9) lease between Jasniowski and mother for building
10) bylaws of Avana
11) handwritten note by Jasniowski
12) copies of identification cards of Tews and Rushing
*755 The record also contains the objections and responses to a proposed order filed by the parties' respective counsel including their commentary on The Restoration Act. However, neither counsel for Rushing nor the Commission requested leave to supplement the record, take additional testimony, reopen the proof or submit additional information as to the City's burden to establish its compelling governmental interest in its ordinance and its least restrictive means to achieve that end.
The record is silent as to the City's interest, if any, in the purpose of its ordinance. There is no testimony, no exhibit, no comment by counsel, nothing which supports any compelling governmental interest. There is no evidence of the number of people effected, the number of rental units not available because of the religious beliefs of the owners, the types of housing available as an alternative, or the length of time it takes to find appropriate housing. Not surprisingly, there is no evidence regarding the least restrictive means of enforcement.
Nevertheless, the Commission's position, as urged by counsel for the Commission in its brief on appeal, is that the policy preamble to the ordinance alone establishes compelling governmental interest. The commission's counsel explains:
"[I]n this instance, the City has a compelling interest in prohibiting discrimination based on marital status.
The City has identified its interest in prohibiting housing discrimination because of marital status in section 5-8-010 of the Fair Housing Ordinance:
`It is hereby declared the policy of the city of Chicago to assure full and equal opportunity to all residents of the city to obtain fair and adequate housing for themselves and their families in the city of Chicago without discrimination against them because of their race, color, sex, age, religion, disability, national origin, ancestry, sexual orientation, marital status, parental status, military discharge status or source of income.' [Chicago Municipal Code § 5-8-010 (amended December 21, 1988).]
The policy prohibiting discrimination based on marital status is reflected as well in other ordinances and in provisions of the City's various agreements with its employees, thus demonstrating the consistency and strength of the City's policy * * *"
The trial court likewise concludes in a footnote that:
"[a]lthough Respondents do not think that a prohibition against discriminating against unmarried cohabitation may advance the welfare of the citizens of the State or the City, we have no difficulty in concluding that it would, and defer to the judgment of the City Council in that regard in any event."
The Commission and the trial court take a unique approach to lack of proof: "If the government says it, it must be so."
And here, the majority finds that the policy preamble plus Rushing's testimony as to his individual experience establishes compelling governmental interest. The majority reasons that
"* * * in this case, the City of Chicago's concern in prohibiting housing discrimination against unmarried, cohabiting couples promotes the universal interest of Chicago residents in available housing. The policy statement of the Chicago ordinance secures "full and equal opportunity to all residents of the city to obtain fair and adequate housing for themselves and their families in the city of Chicago without discrimination * * *
Adding the interest of the prospective tenant Rushing changes the equation. The balance thus becomes Jasniowski's free exercise as weighed against the City of Chicago's general interest in preventing housing discrimination and Rushing's individual interest in access to housing * * *"
The majority's only reference to the least restrictive means:
"Chicago's interest in prohibiting this specific housing discrimination is integral to its overall interest in prohibiting all housing discrimination. Accordingly, universal enforcement, including enforcement against Jasniowski, is the least restrictive means available * * *"
*756 The majority's approach to proof is thus little better than that applied by the Commission and the trial court, in essence: "If government says it, and finds one example, it must be so."
Compelling governmental interest has never been established using these novel standards nor should it be. Let us not forget why governmental interest must be compelling and subject to proof: Here, government wishes to restrict an individual's right to practice his religion. With no supporting facts in the record and no legislative findings, I am unwilling to conclude that the mere existence of this ordinance establishes a compelling governmental interest that overrides the burden on Jasniowski's exercise of religion and is the least restrictive enforcement.
Accordingly, I respectfully dissent.